Vincent F. Gerbino, Esquire
BRUNO, GERBINO, SORIANO & AITKEN, LLP
445 Broad Hollow Road, Suite 420
Melville, New York 11747
(631) 390-0010
*Counsel for Plaintiff UNITED SERVICE AUTOMOBILE*
*ASSOCIATION, GARRISON PROPERTY & CASUALTY*
*INSURANCE COMPANY, USAA GENERAL INDEMNITY COMPANY,*
*and USAA CASUALTY INSURANCE COMPANY*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------X
UNITED SERVICES AUTOMOBILE ASSOCIATION,
USAA GENERAL INDEMNITY COMPANY,
USAA CASUALYU INSURANCE COMPANY, and
GARRISON PROPERTY & CASUALTY INSURANCE COMPANY

                                        Plaintiffs,

      -against-

*The Individual Defendant*
JONATHAN LANDOW M.D.

*The Provider Defendants*
MACINTOSH MEDICAL P.C.
ATLANTIC MEDICAL & DIAGNOSTIC, P.C.

*The Unnamed Layperson Owner Defendants*
JOHN AND JANE DOES 1-10

*The Clinic Defendants*
THE ABC CLINICS

        and

*The Referral Entity Defendants*
THE ABC REFERRAL ENTITIES

                                   Defendants.
---------------------------------------------------------------------------X

Plaintiffs, United Services Automobile Association ("USAA"), USAA General Indemnity Company ("USAA GIC"), USAA Casualty Insurance Company ("USAA CIC"), and Garrison Property and Casualty Insurance Company ("Garrison"), (hereinafter referred to as "Plaintiffs"), by and through their attorneys, BRUNO, GERBINO, SORIANO & AITKEN, LLP, as and for their Complaint against the defendants in this action, hereby alleges as follows upon information and belief:

## INTRODUCTION

1.      This action seeks to terminate a vast, and ever evolving fraudulent conspiracy perpetrated against Plaintiffs by the Defendants who have exploited the New York "No-Fault" insurance system by submitting more than $1,985,576.80 in fraudulent medical billing to Plaintiff. Specifically, the Defendants submitted, or caused to be submitted, fraudulent claims using the United States mail seeking payment for hundreds of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, even harmful and otherwise un-reimbursable medical treatment (the "Fraudulent Services"). The Fraudulent Services were purportedly provided to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for coverage under Plaintiffs no-fault insurance policies.

2.      Defendant Jonathan Landow M.D. ("Landow") is the purported owner of the Defendants Macintosh Medical P.C. ("Macintosh") and Atlantic Medical & Diagnostic, P.C. ("Atlantic") (collectively "Provider Defendants"), entities that have billed Plaintiffs and other New York automobile insurers for the excessive and medically useless Fraudulent Services.   Certain unnamed Defendants, some identified and discussed herein, are the true owners/controllers of Defendants Macintosh and Atlantic.

3.      Landow along with the as of yet unnamed Lay Person John and Jane Doe Defendants ("Doe Defendants"), the ABC Clinic Defendants ("Clinic Defendants"), and the ABC Referral Entity Defendants (Referral Entities), perpetrated the fraudulent scheme using illegal referral fee payment arrangements to permit Macintosh and Atlantic to access a vast number of New York-based patients, in order to fraudulently bill Plaintiffs; and to refer patients to the Referral Entities – many of whom are not even licensed medical professionals – in a manner by which the Clinic Defendants could pick and choose which Referral Entity would get the referral based upon the highest illegal referral fee amount offered, in a fraud auction of sorts. In turn, the Referral Entity would fraudulently bill Plaintiffs.

4.      All this mayhem was and continues to be used to exploit New York's no-fault insurance system for financial gain without regard to genuine patient care and to the actual detriment of the patient.

5.      This action seeks to recover more than $770,596.53 that the Provider Defendants wrongfully obtained from Plaintiffs, by submitting or causing to be submitted to Plaintiffs, hundreds of fraudulent no-fault insurance charges seeking payment for medically unnecessary, experimental, excessive, and otherwise non-reimbursable healthcare services including, but not limited to, boilerplate initial and follow-up examinations; extracorporeal shockwave therapy ("ESWT"); transcranial doppler testing ("TCD"); vestibular evaluation; caloric vestibular testing; sinusoidal vertical axis rotational testing; injection therapy including steroids and trigger point allegedly utilizing ultrasonic guidance for needle placement; outcome assessment testing; durable medical equipment ("DME"); medically unnecessary MRIs; and videonystagmography testing ("VNG") (collectively, referred to as the "Fraudulent Services").

6.     The Fraudulent Services allegedly were provided to New York automobile accident victims who were insured by Plaintiffs ("Insureds").

7.     This action further seeks a declaration that Plaintiffs are not legally obligated to pay reimbursement of more than $1,383364.60 in pending no-fault insurance claims that have been submitted by or on behalf of the Provider Defendants.

8.     The Defendants at all relevant times have known that:

i)      the Fraudulent Services that were allegedly provided by and billed through the Provider Defendants were at all relevant times operated, managed, and controlled by the layperson Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on Plaintiffs and other New York automobile insurers;

ii)     the Fraudulent Services that were allegedly provided by and billed through the Referral Entities were at all relevant times operated, managed, and controlled by laypersons for purposes of effectuating a large-scale insurance fraud scheme on Plaintiffs and other New York automobile insurers

iii)    all the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants, the Clinics and the "funders;"

iv)     the claim submissions seeking payment for the Fraudulent Services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided to Insureds; and

v)      the Provider Defendants and Referral Entities were not in compliance with all significant laws and regulations governing healthcare practice and licensing; as a result, they were not eligible to receive no-fault reimbursement in the first instance;

vi)     the Fraudulent Services were not provided in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws

and, therefore, were not eligible for no-fault reimbursement in the first instance;

vii)   the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and

9.   The use of "funding" wherein entities will buy no fault claims for upwards of 37.5% in up-front cash is the accelerant that has led to an explosion of bogus bills for services that were never rendered and never took place.  A variety of laypersons simply create false bills and supporting documentation which they supply to the funders in exchange for 37.5% of the alleged face value of the bill in cash.   They then quite literally take the money and run.

10.   The Defendants engineered this fraudulent scheme in anticipation of, and on the heels of, material changes adopted by the New York Department of Financial Services regarding the application of the New York Workers Compensation Fee Schedule ("Fee Schedule") to New York's no-fault reimbursement. Those changes eliminated alleged billing abuses and fraudulent treatment practices that had plagued the automobile insurance industry for more than a decade by, among other things, (i) making services that had been abused either ineligible for or subject to reduced reimbursement, (ii) limiting chiropractor billing to CPT codes, and (iii) controlling concurrent care to patients by establishing daily reimbursement limits for all related disciplines.

11.   In contrast to the above changes, the Fee Schedule changes did not materially alter reimbursement for many of the Fraudulent Services and thereby promoted even greater excesses that were supposedly remedied.   Importantly, the fee schedule changes for the first time established a definitive rate of reimbursement of approximately $700.00 for performance of

ESWT, which has historically been a Category III Code (0101T) with a "BR" designation, meaning that definitive reimbursement had not previously been established. Prior to October 2020, ESWT was virtually never performed upon automobile insurers, in part because of the lack of established reimbursement and because – if properly performed – the service required considerable investment, including direct involvement by a physician in the performance of the service and the use of physical equipment that is very costly and is not typically portable.

12.    Defendants seized on these changes in the Fee Schedule.   As a result, ESWT and other Fraudulent Services began being performed in bulk amounts. The Defendants, including the Doe Defendants, concocted a fraudulent treatment and billing scheme pursuant to which:

>    (i) unlicensed "technicians" would allegedly render the Fraudulent Services on an itinerant basis at a large number of multidisciplinary clinics located throughout the New York metropolitan area that purported to provide treatment to patients with no-fault insurance, but which in actuality were organized to supply centralized "clinic" locations for a wide variety of no-fault insurance fraud (the "Clinics"),

>    (ii) laypersons would then generate falsified reports to create a false justification for the performance of the medically unnecessary and illusory Fraudulent Services, and

>    (iii) the reports, documents and bills for thousands of dollars per patient per date of treatment would be sent to New York automobile insurance companies, including Plaintiffs, seeking payment for the performance of the Fraudulent Services.

13.    The scheme required coordination between Landow, the Provider Defendants, the Doe Defendants, the Clinic Defendants and the Referral Entities. In furtherance of the fraudulent scheme, they took the following actions:

>    i)    Landow allowed the Doe Defendants to use his name, medical license and the Provider Defendants to bill Plaintiffs and other New York automobile insurance companies for the alleged performance of the Fraudulent Services.

ii)    Landow and the Provider Defendants associated with "facilitators" who are among the Doe Defendants. Facilitators are individuals and/or entities within the underground criminal side of the no-fault industry who earn money by: (i) establishing relationships with laypersons that are associated with the Clinics, (ii) collecting the no-fault claims (i.e. the paperwork) from the Clinics for services that are allegedly provided to individuals covered by no-fault insurance, and (iii) referring the no-fault billing and collection work to New York collection lawyers.

iii)    Landow and the Provider Defendants through their association with the Doe Defendants and the Clinic Defendants, established (i) illegal referral fee payment arrangements with the owners/managers of the Clinics to allow the Defendants to access a torrent of patients so that they could fraudulently bill Plaintiffs and other automobile insurers; and (ii) established illegal referral fee payment arrangements with the Referral Entity Defendants that created a mechanism for Landow and the Provider Defendants to provide blind referrals to the clinics such that the clinics could broker the referrals to the highest paying Referral Entities.

14.    The Doe Defendants: (i) used Landow's medical license, tax identification numbers of the Provider Defendants and electronic or other forgery of medical professional's signatures to generate false documents, including NF-3 forms (i.e. bills), referrals and other medical records, and (ii) used the Provider Defendants to serve as the billing vehicle through which the Provider and Referral Entity Defendants in association with the Doe Defendants, perpetrated a fraudulent scheme wherein millions of dollars of billing for Fraudulent Services were submitted to Plaintiffs and other New York automobile insurers.

15.    Because the Provider Defendants and Referral Entities were nothing more than shells to hide the Doe Defendants' participation in the scheme, it was equally critical to the success of the fraudulent scheme for the Defendants to partner with New York collection attorneys to (i) submit the fraudulent bills to insurers; (ii) pursue collection lawsuits and/or arbitrations seeking

payment on the claims denied; and (iii) deposit the payments received from automobile insurers through their attorney IOLA/Trust accounts, and distribute the ill-gotten gains. In this scheme lawyers have crossed the line of representation to facilitation.

16.     The Doe Defendants used the information received from Landow to fabricate: (i) the claim documents necessary to support the fraudulent claim submissions, including medical records; (ii) the referrals; (iii) the engagement letter and associated documents needed by the collection lawyers to bill and collect on the Fraudulent Services.

17.     Once the documents associated with billing, collection and funding efforts including referrals were in place, the fabricated claim documents were processed into bills and then organized and mailed to Plaintiffs and other insurance companies seeking payment.

18.     When Landow's fraudulent Macintosh based practices were detected Landow simply stopped operating the fiction of Macintosh and replaced it with – "upon the advice of counsel" – the fiction of Atlantic.   Atlantic simply uses the same employees, the same clinics and the same John and Jane Doe layperson ownership as Macintosh.

19.     The claims associated with each Provider Defendant, are set forth in a large, representative sample of the fraudulent claims that have been identified to-date that the Defendants have caused to be submitted to Plaintiffs and will be made available or exchanged in electronic discovery format.

**PARTIES**

**A.     PLAINTIFF**

20.     United Services Automobile Association ("USAA"), a reciprocal interinsurance exchange organized under Texas law that is an unincorporated association, duly authorized to engage in and conduct the business of an insurance company in the State of New York.

21.     USAA Casualty Insurance Company ("USAA CIC"), a Texas corporation, is not publicly held.  It is a wholly owned subsidiary of United Services Automobile Association ("USAA"). USAA CIC is duly authorized to engage in and conduct the business of an insurance company in the State of New York

22.     USAA General Indemnity Company ("USAA GIC"), a Texas corporation, is not publicly held.  It is a wholly owned subsidiary of United Services Automobile Association ("USAA"). USAA GIC is duly authorized to engage in and conduct the business of an insurance company in the State of New York

23.     Garrison Property and Casualty Insurance Company ("Garrison"), a Texas corporation, is not publicly held. It is a wholly owned subsidiary of USAA Casualty Insurance Company ("USAA CIC").   Garrison is duly authorized to engage in and conduct the business of an insurance company in the State of New York

**B.**   **DEFENDANTS**

24.     Jonathan Landow M.D. is a citizen of the State of Florida.

25.     Macintosh Medical P.C. is a Domestic Professional Service Corporation that was registered in New York County on October 4, 2002, that lists Defendant Jonathan S. Landow MD as the CEO with an address of 3530 Mystic Pointe Dr., Suite 1402, Aventura, Florida 33180. The Department of State Service of Process address is Harfenist Kraut & Pearlstein LLP, 3000 Marcus Avenue, Suite 2E1, Lake Success, NY 11042. Department of State records indicate that Macintosh's last statement was due on October 31, 2022.

26.     Atlantic Medical & Diagnostic P.C. is a Domestic Professional Service Corporation that was registered in Nassau County on September 28, 1998, that lists Defendant Jonathan S. Landow MD as the CEO with an address of 575 Underhill BLVD, STE #225, Syosset, New York

11791. The Department of State Service of Process address is Harfenist Kraut & Pearlstein LLP, 3000 Marcus Avenue, Suite 2E1, Lake Success, NY 11042. Department of State records indicate that Atlantic's last statement was due on September 30, 2006 – 17 years ago.

27.     The Doe Defendants are laypersons that control the medicine at Macintosh and Atlantic as well as the medicine at the Referral Entities and the Clinics.

28.     The Clinic Defendants are multidisciplinary medical facilities located throughout the New York City metropolitan area that broker patients to the Provider Defendants in exchange for illegal referral fee payments and referrals to the Referral Entities.

29.     The Referral Entities are a series of entities – some brazenly do not even purport to be medical professional entities – that bid on and purchase referrals for bogus services.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

31.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 *et seq*. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

32.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

33.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(b)(1), as the Eastern District of New York is the District where one or more of the Defendants reside.

34.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(b)(2), because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## AN OVERVIEW OF THE PERTINENT LAW GOVERNING NO-FAULT INSURANCE REIMBURSEMENT

35.     Plaintiffs are licensed to and in do in fact issue automobile insurance policies in New York and New Jersey.

36.     New York's no-fault insurance laws are designed to ensure that injured casualties of motor vehicle accidents have an efficient means to receive the healthcare that they need.

37.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (*N.Y. Ins. Law §§ 5101, et seq.*) and the regulations promulgated pursuant thereto (*11 N.Y.C.R.R. §§ 65, et seq.*), automobile insurers are required to provide no-fault insurance benefits ("Personal Injury Protection" benefits or "PIP Benefits") to Insureds.

38.     In New York, mandatory PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

39.     In New York, an Insured can assign his/her right to PIP Benefits to healthcare goods and services providers in exchange for those goods and services.

40.     In New York, pursuant to a duly executed assignment, a healthcare provider may submit claims directly to the insurance company and receive payment for medically necessary services, using the claim form required by the Department of Financial Services (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

41.     In the alternative, in New York a healthcare provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500 form").

42.     Pursuant to the New York no-fault insurance laws, healthcare providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services, or if they fail to meet the applicable licensing requirements in any other states in which such services are performed.

43.     The implementing regulation adopted by the New York Superintendent of Insurance, *11 N.Y.C.R.R. § 65-3.16(a)(l2)* states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(l) of the Insurance Law if the provider fails to meet *any* applicable New York State or local licensing requirement necessary to perform such service in New York or meet *any* applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

44.     In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services. Unlicensed individuals may ***not***: (a) practice the pertinent healthcare profession; (b) own or control a professional corporation authorized to operate a professional healthcare practice; (c) employ or supervise healthcare professionals; or (d) absent statutory exceptions not applicable, derive economic benefit from professional healthcare services.

45.     New York law prohibits licensed healthcare providers from paying or accepting compensation in exchange for patient referrals. See, _New York Education Law §§ 6509-a; 6531_. Additionally, New York law requires the shareholders of a professional corporation to be engaged in the practice of their profession through the professional corporation for it to be lawfully licensed. See, _N.Y. Business Corporation Law§ 1507._

46.     Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive PIP Benefits if it is fraudulently incorporated, fraudulently licensed, if it engages in unlawful fee-splitting with unlicensed non-professionals, or if it pays or receives unlawful compensation in exchange for patient referrals.

47.     In _State Farm Mut. Auto. Ins. Co. v. Mallela,_ 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect PIP Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.  _See Carothers v. Progressive Ins. Co_., 33 N.Y.3d 389, 2019 N.Y. Slip Op. 4643 *1 (2019).

48.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule")

49.     When a healthcare provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the fees were not excessive.

50.     Pursuant to *New York Insurance Law § 403*, the NF-3 and HCFA-1500 forms submitted by a healthcare provider to Plaintiffs, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## **OVERVIEW OF THE FRAUDULENT SCHEME**

51.     Much of this pleading is based upon the words of Landow garnered predominately from two extensive Examinations Under Oath on April 6, 2022 and May 2, 2023.   There was also a response to a request for post Examination Under Oath additional verification. The hallmark of Landow's responses is that Landow does not control his purported medical practices.

52.     What is most pernicious about Landow, Macintosh and now Atlantic is that they serve as access providers. Specifically, Macintosh and now Atlantic provides a multiplicity of prescriptions and referrals to other exploitive entities for the most dubious medical procedures that currently populate fraudulent no-fault claims.

53.     In return for these referrals Landow, Macintosh, Atlantic and the layperson owners receive a pool of patients that are funneled to them from the layperson managers at approximately 43 different multidisciplinary medical clinics (as confirmed by Landow's Post Examination Under Oath Additional Verification Response and his second round of testimony).   Forty-three (43) different locations that offer multiple providers at each location is staggering.   Many of these providers rely upon the initial and follow-up examinations performed by Macintosh and Atlantic – and the attendant referrals – to perform illegitimate services and submit bills for these services.

54. The Provider Defendants referrals are tailor made to be sold to the highest bidders from amongst the Referral Entities by virtue of the following: According to Landow's response to Post Additional Verification dated May 26, 2022:

> Each referral is given to the provider [Landow's alleged employee] with the patient chart. This includes a blank referral for MRI, DME and any other referred testing. After the provider evaluates the patients, they sign in the referral that is needed and are directed to add this referral in their notes under plan … the referral, if applicable, is communicated with the office staff (not Macintosh staff), the office staff (not Macintosh staff) are the ones giving this document to another provider who is performing the referred service.

This response is a flat-out admission of the very mechanics of the scheme.

55. Illegal referral fee payments are key, however they are not necessary in a quid quo pro, referral for referral, illegal referral scheme. This is corroborated by the fact that in the past Landow would refer from one Landow owned P.C. to another allegedly Landow owned P.C. in an illegal self-referral scheme. (There was a total of eight (8) Landow medical PCs including Macintosh involved in this scheme) As a result of Civil RICO activity that targeted that scheme Landow abandoned it in favor of a scheme where referrals are made to the Referral Entities. Macintosh became the sole remaining P.C. from amongst the eight according to Landow himself.

56. When Plaintiffs uncovered Landow's current scheme involving Macintosh Landow "on the advice of counsel" abandoned Macintosh in toto – it no longer sees patients. All the staff; clinic locations; and patients simply were transferred to Atlantic which was a PC that Landow and his handlers formed in 1998 and had laid dormant for decades.

57. Macintosh and Atlantic do not engage in any form of marketing or advertising to obtain patients. Instead, patients were obtained from layperson managers that directed patients to

Macintosh from the Clinics' front desks.   That is the sworn testimony of Landow.   These patients are purchased through carefully crafted "license and service agreements" with the purported clinic owners which we obtained.   Further there is "under the table" money that is secreted to the layperson owners of the clinics. To that end Landow's counsel refused to provide any financial documents in post EUO additional verification.   Counsel would not allow Landow to answer financial questions at his Examinations Under Oath.

58.    Landow and his layperson handlers were forced to create multiple billing entities due to the large volume of actions for insurance fraud that have thus far been lodged against Landow and Landow entities as well as investigations.

59.    Landow opened the above entities at the behest of these laypersons to whom he ceded total control of the business entities such that the laypersons could otherwise do what they were forbidden by law to do – practice medicine.

60.    Once in control of the purported Landow entities the laypersons created a fraudulent protocol of predetermined treatment that was not based upon medical necessity or the needs of patients but rather solely the desire to maximize profits at the expense of insureds.

61.    Landow, the Provider Defendants' and the Referral Entities' patient base is controlled by laypersons.

62.    Landow, the Provider Defendants and the Referral Entities practice out of numerous multidisciplinary medical clinic locations. Specifically, Plaintiffs have received billing for services that allegedly occurred at literally multiple dozens of different locations beyond the 43 clinic locations when factoring in the Referral Entities.

63.     In order to gain access to these patients Landow, the Provider Defendants and their true owners pay illegal referral fees to the layperson owners of these clinics often disguised as rent, billing services, management services, consultation services and supplies.

64.     Landow and the Provider Defendants will cut checks ostensibly for some or all the above or similar services that are simply converted to cash by money laundering entities in order to pay the layperson clinic owners.

65.     The Provider Defendants refer a multiplicity of medically unnecessary diagnostic procedures to falsely support findings of injury thereby justifying further treatment.

66.     All of this is done to the detriment of insurers like Plaintiffs and callously to the detriment of the patient/claimants who are undergoing unnecessary invasive procedures.

**A.      Access to Patients**

67.     The Provider Defendants had and have no legitimate indicia.   There are no fixed treatment locations of any kind, no stand-alone practices, they are not the owner or leaseholder in any of the real property from which they purport to provide the Fraudulent Services, they do not employ their own business support staff, and do not market their services to the general public.

68.     The Doe Defendants accelerated the fraudulent scheme by using the name of Landow and the Provider Defendants on an itinerant basis in connection with the performance of the Fraudulent Services from more than forty three separate Clinics, primarily located in the five boroughs and surrounding vicinities, where they were given access to never-ending volumes of patients pursuant to the unlawful referral arrangement.

69.     To obtain access to the Clinics' patient base, the Defendants entered illegal financial arrangements with the unlicensed individuals that controlled the Clinics, who provided access to patients and were purported to be treated at the Clinics. Though supposedly organized to

provide a range of healthcare services to Insureds at a single location the Clinics centralized a vast array of fraudulent services and ersatz providers in one building at heavily trafficked locations.

70.     Clinics provided a "revolving door" of shell and sham healthcare service professional corporations and/or a multitude of other purported healthcare providers that are not even registered with the Office of the Professions.

71.     Plaintiffs received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice," without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company and other investigations.

72.     In general, the referral sources at the Clinics were paid a sum of money in untraceable cash or payments typically disguised as "rent" or other services.

73.     Neither Landow, the Provider Defendants nor Referral Entities ever had a genuine doctor-patient relationship with the Insureds that visited the Clinics nor did the Insureds ever have any scheduled appointments. The reason for this is because in connection with the "pay to play" arrangement, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinic's "representatives" for the performance of the Fraudulent Services.

74.     Clinic "representatives" typically making the referrals were receptionists or some other non-medical personnel who simply "steered" the Insureds to whichever practice was being given access to the Insureds on a given day pursuant to the unlawful referral payment arrangement.

**B.     The Fraudulent Billing and Treatment Protocols Employed by The Defendants**

75.     The Fraudulent Services billed in the name of the Provider Defendants and Referral Entities were provided, to the extent they were provided at all, pursuant to pre-determined

fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds. They were provided pursuant to the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

76.     Neither Landow nor any other licensed physicians were ever involved in the performance of the Fraudulent Services. Unlicensed laypersons developed and controlled the patient base at the Clinics and the resulting referrals.

77.     Once they were given access, the Doe Defendants arranged to have Insureds at the Clinics subjected to the Fraudulent Services by unlicensed technicians that they controlled despite there being no clinical basis for the services.  Patients were subjected to services that were unnecessary and experimental solely to maximize profits without regard to genuine patient care.

78.     Individuals operating the No-Fault Clinics generate stamped reports in the name of other healthcare providers that were generic, preprinted, and boilerplate for the purposes of justifying the performance of the Fraudulent Services.

79.     The documents stamped with the name of these Referring Providers often failed to document whether the Insured referred for the Fraudulent Services exhibited any of the conditions that would necessitate performance of the Fraudulent Services.

80.     In fact, there was no physician involvement with the performance of many of the Fraudulent Services.

81.     Regardless of the nature of the accidents or the actual medical needs of the Insureds, the Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual presentment.

82.     Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent

step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

83.     All decision-making authority relating to the operation and management of Landow, the Provider Defendants and Referral Entities has been vested entirely with Doe layperson Defendants.

## THE FINDINGS OF USAA'S INVESTIGATION CORROBORATE THE ABOVE ALLEGATIONS

### A. MACINTOSH AND LANDOW

84.     Macintosh is untethered to any medical professional supervision or ethics.

85.     Jonathan Seth Landow was born in 1959.   He resides in Florida and, in fact, appeared remotely at his Examinations Under Oath from his home in Florida.

86.     His Florida address is 3530 Mystic Pointe Drive, Adventura, Florida 33180.   He testified that he has a business address of 174 West 4th Street, Suite 324, New York, New York 10014 that appears to be just a mailbox.   Online records indicate that he no longer holds his Florida medical license which he allowed to lapse as of 2020 although he testified on April 6, 2022 that he was licensed to practice in Florida and New York.   Landow testified that he has been licensed to practice in New York since 1998.   He also testified that his specialty is internal medicine.   Macintosh practiced in the field of orthopedic evaluations (of which Landow knows nothing about), pain management (of which Landow knows nothing about) and "primary care internal medicine."

87.     Listed below are just some of Landow's shell medical professional corporations:

- **MacIntosh Medical PC** (174 West 4th Street Suite 324 NY, NY 10014 (MailBox Etc.), incorporated 10/4/2002, active, registered agent: Steven J. Harfenist (Harfenist Kraut and Perlstein LLP 3000 Marcus Avenue, suite 2E1 Lake Success NY 11042).

20

- **Birch Medical and Diagnostic PC** (174 West 4th Street Suite 324 NY, NY 10014 (MailBox Etc.), incorporated 10/4/2002, active, registered agent: Steven J. Harfenist (Harfenist Kraut and Perlstein LLP 3000 Marcus Avenue, suite 2E1 Lake Success NY 11042).

- **Eastern Medical Practice PC** (2000) AKA Sunrise Medical and Diagnostic PC (1997) and Seniorcare Medical Services PC (1998) (174 West 4th Street Suite 324 NY, NY 10014 (MailBox Etc.), incorporated 12/11/97, active, registered agent: Steven J. Harfenist (Harfenist Kraut and Perlstein LLP 3000 Marcus Avenue, suite 2E1 Lake Success NY 11042).

- **Empire Medical Services PC AKA New Age Dermatology** (45 East 89th Street, Suite 18D NY, NY 10128), incorporated 5/3/2002, active, registered agent: Steven J. Harfenist (Harfenist Kraut and Perlstein LLP 3000 Marcus Avenue, suite 2E1 Lake Success NY 11042).

- **Paramount Medical Services PC AKA Vein Care of America and Vein Care of New York** (45 East 89th Street, Suite 18D NY, NY 10128), incorporated 12/19/2011, active, registered agent: Steven J. Harfenist (Harfenist Kraut and Perlstein LLP 3000 Marcus Avenue, suite 2E1 Lake Success NY 11042), treatment location: 201 Dolson Avenue Middletown NY.

- **Preferred Medical PC** (45 East 89th Street, Suite 18D NY, NY 10128), incorporated 2/3/09.

- **Sovereign Medical Services PC** (174 West 4th Street Suite 324 NY, NY 10014 (MailBox Etc.), incorporated 5/26/2010, active, registered agent: Steven J. Harfenist (Harfenist Kraut and Perlstein LLP 3000 Marcus Avenue, suite 2E1 Lake Success NY 11042).

- **Spruce Medical and Diagnostic PC** (174 West 4th Street Suite 324 NY, NY 10014 (MailBox Etc.), incorporated 10/4/02.

- **Summit Medical Services PC** (2000) AKA Woodhaven Medical Services PC (1998) (174 West 4th Street Suite 324 NY, NY 10014 (MailBox Etc.), incorporated 5/4/1998, active, registered agent: Steven J. Harfenist (Harfenist Kraut and Perlstein LLP 3000 Marcus Avenue, suite 2E1 Lake Success NY 11042).

- **Urban Medical PC** (100 Hilton Ave #803 Garden City, NY 11530), incorporated 9/11/15, active, registered agent: Steven J. Harfenist (Harfenist Kraut and Perlstein LLP 3000 Marcus Avenue, suite 2E1 Lake Success NY 11042).

- **New York Medical, Inc.** (2 Jericho Plaza Wing B, Jericho NY 11753), incorporated in Delaware, 2329694 (3/19/93) and 3308151 (10/26/00).

- **Sound Medical PC**, incorporated 10/4/2002, active, registered agent: Steven J. Harfenist (Harfenist Kraut and Perlstein LLP 3000 Marcus Avenue, suite 2E1 Lake Success NY 11042).

88.     Macintosh is a transient pain management provider which bills for services at numerous locations associated with unlawful lay person controlled medical clinics in the New York City metropolitan area.

89.     Landow spends most of his time in Florida. He does not see or treat patients of Macintosh and offers no supervision to his alleged employees that purportedly see patients.

90.     Macintosh employees are listed as the referring party on prescriptions for experimental testing and treatments performed by other entities associated with the clinics. Macintosh confirmed through the Examination Under Oath of Landow and Post Examination Under Oath additional verification that many of the referrals were "not authentic."

91.     The "treatment" is templated, for example:

(i) Out of 175 claims billed by Macintosh, 160 (91%) had billing for "Outcome Assessment Testing" billed as code 99358: "Prolonged evaluation and management services before & after direct patient care 1st hr."   The outcome assessment testing is just a patient questionnaire. Outcome Assessment Tests were usually billed with the physical examination or a few days later.

(ii) Out of 175 claims billed by Macintosh, 140 (80%) received trigger point injections.

(iii) 100% of the new patient exams were billed as code 99204.

(iv) Referrals for diagnostic testing and Shock Wave Therapy ("ECSWT") confirmed to be "authentic" by counsel for Macintosh Medical included referrals where there is no evidence that the referring provider from Macintosh had examined or treated the patient at the time of the referral.

(v) According to counsel for Macintosh Medical, the referrals for ECSWT and Diagnostic Testing were given to the unlicensed office staff at the clinics. In some cases, the referrals were left blank as to what tests were to be performed, leaving those decisions to unlicensed staff. In addition, the referrals were used to justify medical treatment and testing by unlicensed entities.

92.     The Macintosh referrals were also used to justify treatment later found to be falsified. As an example: USAA has affidavits from three (3) medical providers who stated that billing for services was rendered in their name without their involvement or authorization.

93.     Macintosh Medical is being used for other separate fraud schemes involving money laundering. (See *GEICO v. Landow* discussed *infra* where Dr. Landow claims he didn't know checks were being issued to Macintosh Medical and cashed at check cashing entities. Counsel claimed that Macintosh was unaware of the scheme involving entities (and a physician employee of Macintosh) issuing checks to Macintosh and cashing them at a check cashing facility in New Jersey. (2022-cv-0328 – Letter from Counsel for Macintosh)

94.     After it was disclosed that prescriptions for diagnostic testing and shockwave therapy were being forged in the name of Macintosh Medical employees at several locations, Macintosh did not stop receiving patient referrals and seeing patients at these locations.

95.     Landow was recorded on a wiretap in the *US v Rose/Coles* case where lay people controlled medical facilities and paid illegal referral fee payments for patient referrals. Landow entered into agreements with facilities that a convicted felon – Nat Coles – controlled including SA PT PC, 322 E 149th Street, Bronx, NY. (*See infra*)

96.     During depositions/EUO's taken in the *GEIC) v Landow* case, a "funder" named Roman Matatov was discussed as funding the Landow corporations. A Roman Israilov aka Roman Matatov was arrested in connection with the Bradley Pierre operation (see *USA v Rutland*) discussed *infra*.

97.     USAA discovered that the unlicensed entities, including entities receiving patients based on forged referrals, had access to Macintosh Medical records. Dr. Landow continued to allow his practice to use these locations and refused to provide USAA with an access roster to investigate the HIPPA breach.

**1.     Landow: A Disquieting History of Legal Woes**

98.     Landow, along with his alleged professional corporations, has an extensive history of involvement in both civil and criminal proceedings that does far more than raise questions:

(i) *GEICO v. Jonathan Landow, Jonathan Landow, M.D., Paramount Medical Services, P.C.; Sovereign Medical Services, P.C.; Birch Medical & Diagnostic, P.C.; Spruce Medical & Diagnostic, P.C.; Summit Medical Services, P.C.; Eastern Medical Practice, P.C.; Macintosh Medical, P.C., And John Doe Defendants "1-10" (1:21-Cv-01440-NGG-RER)*:

allegations against Landow and multiple entities purportedly owned by Landow credibly allege massive self-referral scheme with "myriad of medically unnecessary and excessive healthcare services, including purported initial and follow-up examinations, outcome

assessment testing, …'EDX testing'… interventional pain management procedures, including various injections, Localized Intense Neurostimulation Therapy and Trigger Point Impedance Imaging ("LINT/TPII Treatment"), acupuncture treatment, physical therapy treatment and surgical services, including but not limited to platelet-rich plasma ("PRP") injections and arthroscopic surgeries."  GEICO responded to a motion to dismiss with several exhibits including checks that had been issued to Macintosh and cashed at a check cashing facility in NJ. In response, Macintosh wrote "a thanks must be given to GEICO for discovering checks made payable to Macintosh Medical that appear to have been cashed in New Jersey. Macintosh and Dr. Landow had no idea about these checks, or the entities that wrote them (except for Conrad Cean who came to work for Macintosh months later and has been terminated due to an inability to explain the check)." (Letter from Counsel for Macintosh) Throughout his Examinations Under Oath Landow consistently feigned outrage when confronted with fraudulent referrals and blamed everyone save himself for handing his medical practices over to crooks in exchange for a no show job in New York whilst he enjoyed the sun in Florida.

(ii) *GEICO v. Urban Medical, P.C. et al* is a 2018 RICO (8-CV-2956 EDNY)

alleged in part "Landow…was engaged in a scheme to defraud GEICO through the performance of medically unnecessary EMG/NCV testing based on improper financial arrangements…"

(iii) *USAA v. Rutland Medical, P.C., et al.,* (1:2018-cv-04727 EDNY) (RICO Fraud pleading)

Macintosh Medical treats patients at facilities formerly operating as Rutland Medical. These patients are referred by Rutland or its successors to Macintosh.

(iv)*United States of America v Bradley Pierre, Marvin Moy, William Weiner, Andrew Prime and Arthur Bogoraz* (1:22-cr-00019 SDNY)

Federal Indictment alleges that from 2008 through 2021, "the Pierre Conspirators fraudulently owned and controlled five medical professional corporations – including clinics and an MRI facility…defrauded automobile insurance companies by billing insurance companies for unnecessary and excessive medical treatments, falsifying clinical findings of injuries in MRIs…[Pierre] financed a widespread bribery and kickback scheme to bring patients into the facilities."

Based on the prior investigation of these parties, USAA ascertained that the addresses used by the defendants included addresses where the defendant's referred patients to Macintosh Medical.

(v) *United States of America v Nathaniel Coles* 19 Cr. 789 (PGG) (SDNY)

On June 28, 2021 Nathaniel Coles plead guilty to conspiring to engage in a bribery scheme (in violation of the travel act). The unsealed wiretap affidavits show that Anthony Rose and "Nat" Coles controlled medical clinics including 332 E 149th St, Bronx, NY. In February of 2017, Landow was recorded on a wiretap discussing working for Coles at one of his clinics. The Wiretap Affidavit stated:

*"Coles told the doctor that he was ready to have him start. Dr. Landow responded that he needed a week or two so he could get people to respond and put them on the schedule. The doctor asked if Coles could wait, and Coles responded, "no problem." Landow asked if they were going to be doing internal medicine and the pain, or just one or the other, and Coles explained that they were doing internal medicine and pain 'in the office,' and confirmed that they had someone who would take 'these people (patients) to the surgery center.' Landow informed Coles that they (possibly meaning the doctor's office) had different levels of involvement, sometimes they just did office space and sometimes they did 'the whole enchilada.'"*

At his May 2, 2023 Examination Under Oath Landow would say this of Coles: "*I think he may have been associated with an office that I had a presence in for a brief period of time ... it was probably over five years ago ... And I don't recall which one ... [flurry of counsel objections] And I haven't had contact with him for probably, I'm guessing, five years, give or take ... If I'm remembering the individual correctly, then he was – he would fall into the administration category.*"

Landow is probably correct that he has not seen Coles in sometime since Coles has been locked up in a federal prison for at least a few years.

(vi) *Travelers Insurance et al v. Jonathan Landow et al* (NY County 656567/2021)

Travelers Insurance alleges that medical services rendered by the Defendants (2017 to present) were fraudulent and part of a systematic pattern of fraud.

99.     Landow stopped billing insurers for services provided to no-fault insureds. However, after a series of legal woes that left Landow destitute due to liability for large financial repayments to the U.S. Government and others, Landow again began desperately billing insurers in the year 2016. *See e.g. Landow v. Commissioner of Internal Revenue*, 2011 T.C. Memo 177 (U.S. Tax Court, 2011); *Landow v. Wachovia Securities, et al.,* 966 F. Supp2d 166 (E.D.N.Y. 2013); *Carbon Capital Mgt., LLC v American Express Co.,* 2010 NY Slip Op 30477(U) (Sup. Ct. Nassau Cty. 2010); *Bronte SPV, LLC. v. Jonathan Landow, et al.,* 601591/2017 (Sup. Ct. Nassau Cty. 2017).

100.    Landow was named as a defendant in no-fault fraud action entitled *GEICO, et al. v. Empire Medical Services, P.C., et al.,* Docket No. 18-CV-2956 (BMC), where GEICO claimed that Landow through two companies he owned, was engaged in a scheme to defraud GEICO through the performance of medically unnecessary EMG/NCV testing based on improper financial arrangements which allowed him access to various medical clinics.

101.    Landow was also susceptible to participation in questionable activity as the result of other financial deals he entered, which resulted in Landow being named as a defendant in an action to recover millions of dollars. *See Qwil PBC, et al., v. Jonathan Landow, et al.*, 653605/2019 (Sup. Ct. New York Cty). In *Qwil* the plaintiffs, a funding company and billing company, with whom Landow entered into various agreements with to advance funds and act as a billing company for some of his entities, alleged that Landow, Paramount, Preferred and Sovereign were in breach of contract and owed over $2,000,000.00 in funds that had been advanced by plaintiffs based on the purported sale of receivables to plaintiffs. During the litigation, Plaintiffs alleged that Landow violated court orders and fraudulently transferred money to family members in order to evade collection. *See GEICO v. Jonathan Landow, M.D., Paramount Medical Services, P.C., Preferred*

*Medical, P.C., Sovereign Medical Services, P.C., Birch Medical & Diagnostic, P.C., Spruce Medical & Diagnostic, P.C., Summit Medical Services, P.C., Eastern Medical Practice, P.C., Macintosh Medical, P.C., and John Doe Defendants "1-10"* 1:21-cv-01440-NGG-RER (EDNY) (The massive self-referral scheme)

102.    As of 2021 Landow was operating eight different professional corporations in what was an illegal self-referral insurance fraud scheme.   At his April 6, 2022 EUO Landow was asked point blank about self-referrals from one Macintosh entity to another. Landow responded thusly: "That is impossible … Macintosh is the only active professional corporation."   The GEICO action caused Landow to change the manner he and his handlers operated.

103.    Plaintiffs received billing from Macintosh using the following service addresses between January 2020, and June 2022.

| CLINIC LOCATION | CITY | BILLED |
|---|---|---|
| 3910 Church AVE | Brooklyn | $ 118,621.22 |
| 1120 Morris PARK AVE | Bronx | $ 63,257.46 |
| 4250 White PLNS RD | Bronx | $ 57,552.25 |
| 430 W Merrick RD | Valley Stream | $ 56,534.72 |
| 71 South Central AVE | Valley Stream | $ 48,764.92 |
| 599 Southern BLVD | Bronx | $ 47,663.12 |
| 1320 Louis Nine BLVD | Bronx | $ 47,200.84 |
| 1894 Eastchester STE 201 | Bronx | $ 43,983.84 |
| 11 E Hawthorne AVE 3rd FL | Valley Stream | $ 43,798.91 |
| 632 Utica AVE | Brooklyn | $ 40,178.17 |
| 219 Hempstead Turnpike | West Hempstead | $ 27,779.10 |
| 513 Church AVE | Brooklyn | $ 24,682.81 |
| 611 E 76th ST | Brooklyn | $ 22,451.47 |
| 647 Bryant AVE #2 | Bronx | $ 22,016.36 |
| 3407 White PLNS RD | Bronx | $ 19,711.72 |
| 175-20 Hillside AVE 2nd FL | Jamaica | $ 19,163.32 |
| 787 Meacham AVE | Elmont | $ 18,974.96 |
| 55 E 115th ST | New York | $ 15,977.56 |
| 2260 Hewlett AVE | Merrick | $ 14,373.03 |
| 180-09 Jamaica AVE | Jamaica | $ 12,486.14 |

| 51-27 Queens BLVD 2nd FL 2c | Woodside | $ 11,714.08 |
| 1647 Macombs RD | Bronx | $ 9,202.85 |
| 3626 Bailey AVE | Bronx | $ 8,417.51 |
| 2940 Grand Concourse | Bronx | $ 6,898.86 |
| 591 Steward AVE 4th FL | Garden City | $ 5,337.82 |
| 2386 Jerome AVE 2nd FL | Bronx | $ 4,423.09 |
| 788 Southern BLVD | Bronx | $ 4,173.09 |
| 11605 Myrtle Ave | Richmond Hill | $ 3,877.54 |
| 82-25 Queens BLVD STE 1a | Elmhurst | $ 3,618.04 |
| 3140b E Tremont AVE | Bronx | $ 2,828.40 |
| 550 Remsen AVE | Brooklyn | $ 2,828.40 |
| 1975 Linden BLVD STE 111 | Elmont | $ 2,672.46 |
| 332 E 149th ST STE 200 | Bronx | $ 2,173.37 |
| 4014a Boston RD | Bronx | $ 1,849.02 |
| 1611 B East New York AVE | Brooklyn | $ 1,747.12 |
| 92-12 165th ST | Jamaica | $ 1,249.70 |
| 313 43rd ST | Brooklyn | $ 726.53 |
| 8925 130th ST | Richmond Hill | $ 483.88 |
| 146 Empire BLVD | Brooklyn | $ 422.74 |

104.    Billing stopped coming from Macintosh after June 2022 and Plaintiffs thought, at first, that the scourge had ended.   However, it was soon detected that Atlantic had taken Macintosh's place.

105.    Addresses leased by Macintosh Medical have had the following Federal Civil RICO and Fraud Complaints filed within the last five (5) years alleging lay person control, illegal referral fee payments, self-referrals, predetermined treatment protocol and other chicanery as listed below. In addition, billing has been submitted from these addresses where providers have come forward stating that billing was submitted in their name without their permission or involvement. It is extraordinary in scope:

**11 E Hawthorne Ave**

Government Employees Insurance Company v. Macias (E.D.N.Y 2021)

29

**1120 Morris Park Ave**

Government Employees Insurance Company v. Cecile I Fray, M.D., PLLC (E.D.N.Y 2019)
Government Employees Insurance Company v. Emmons Avenue Medical Office, P.C. (E.D.N.Y 2022)
Government Employees Insurance Company v. Fialkov (E.D.N.Y 2021)
Government Employees Insurance Company v. Kalitenko (E.D.N.Y 2022)
Government Employees Insurance Company v. Macias (E.D.N.Y 2021)
Government Employees Insurance Company v. Malvina Drug Corp. (E.D.N.Y 2020)
Liberty Mutual Insurance Company v. GM Wellness Medical, P.C. (E.D.N.Y 2022)
State Farm Mutual Automobile Insurance Company v. Tandingan P.T. P.C. (E.D.N.Y 2022)

**1320 Louis Nine Blvd.**

Government Employees Insurance Company v. Fialkov (E.D.N.Y 2021)

**14 Bruckner Blvd.**

Government Employees Insurance Company v. Ahmed (E.D.N.Y 2022)
Government Employees Insurance Company v. Emmons Avenue Medical Office, P.C. (E.D.N.Y 2022)
State Farm Mutual Automobile Insurance Company v. Tandingan P.T. P.C. (E.D.N.Y 2022)

**1647 Macombs Rd**

Government Employees Insurance Company v. Ahmed (E.D.N.Y 2022)
Government Employees Insurance Company v. Ready Rx, LLC (E.D.N.Y 2021)

**1894 Eastchester**

Government Employees Insurance Co. v. Caruso (E.D.N.Y 2020)
Government Employees Insurance Company v. Ahmed (E.D.N.Y 2022)
Liberty Mutual Insurance Company v. GM Wellness Medical, P.C. (E.D.N.Y 2022)

**1975 Linden Blvd**

Allstate Insurance Company v. A & F Medical P.C. (E.D.N.Y 2014)
Allstate Insurance Company v. Dowd, M.D. (E.D.N.Y 2019)
Allstate Insurance Company v. Dynasty Medical Care, P.C. (E.D.N.Y 2015)
Government Employees Insurance Co. v. Jacobson, D.C. (E.D.N.Y 2015)
Government Employees Insurance Company v. Ahmed (E.D.N.Y 2022)
Government Employees Insurance Company v. Emmons Avenue Medical Office, P.C. (E.D.N.Y 2022)
Government Employees Insurance Company v. Macias (E.D.N.Y 2021)
Liberty Insurance Corporation v. Mohuchy, D.S. (E.D.N.Y 2014)

Liberty Mutual Insurance Company v. GM Wellness Medical, P.C. (E.D.N.Y 2022)

## 219 Hempstead

Government Employees Insurance Company v. Big Apple Med Equipment, Inc. (E.D.N.Y 2020)
Government Employees Insurance Company v. Ready Rx, LLC (E.D.N.Y 2021)
Government Employees Insurance Company v. Zaitsev (E.D.N.Y 2020)

## 2260 Hewlett Ave

Allstate Insurance Company v. Rauch, D.C. (E.D.N.Y 2022)
Government Employees Insurance Company v. Bi County Medical Diagnostics, P.C. (E.D.N.Y 2018)

## 2386 Jerome Ave

Government Employees Insurance Company v. Big Apple Med Equipment, Inc. (E.D.N.Y 2020)
Government Employees Insurance Company v. Khait, D.C. (E.D.N.Y 2017)
Government Employees Insurance Company v. Ready Rx, LLC (E.D.N.Y 2021)

## 332 E 149th St

Government Employees Insurance Co. v. Caruso (E.D.N.Y 2020)
State Farm Mutual Automobile Insurance Company v. Tandingan P.T. P.C. (E.D.N.Y 2022)

## 3407 White Plains

Government Employees Insurance Co. v. Caruso (E.D.N.Y 2020)
Government Employees Insurance Co. v. Jacobson, D.C. (E.D.N.Y 2015)
Government Employees Insurance Company v. Lexington Medical Diagnostic Services, P.C. (E.D.N.Y 2018)

## 3626 Bailey Ave

Government Employees Insurance Company v. Macias (E.D.N.Y 2021)

• In addition, provider Hussein Y Fatima provided an affidavit that billing submitted to Plaintiff from this address purporting to be from Fatima was not performed by or authorized by Fatima.

## 3910 Church Ave

Government Employees Insurance Co. v. Caruso (E.D.N.Y 2020)
Government Employees Insurance Company v. Cecile I Fray, M.D., PLLC (E.D.N.Y 2019)
GEICO et al v. East Flatbush Medical, P.C. et al (E.D.N.Y 2020)

Government Employees Insurance Company v. Emmons Avenue Medical Office, P.C. (E.D.N.Y 2022)
Government Employees Insurance Company v. Fialkov (E.D.N.Y 2021)
Government Employees Insurance Company v. Kalitenko (E.D.N.Y 2022)
Government Employees Insurance Company v. Lam (E.D.N.Y 2021)
Government Employees Insurance Company v. Lexington Medical Diagnostic Services, P.C. (E.D.N.Y 2018)
Government Employees Insurance Company v. Macias (E.D.N.Y 2021)
Government Employees Insurance Company v. Malvina Drug Corp. (E.D.N.Y 2020)
Government Employees Insurance Company v. Zilberman, D.C. (E.D.N.Y 2020)
Liberty Mutual Insurance Company v. GM Wellness Medical, P.C. (E.D.N.Y 2022)
State Farm Mutual Automobile Insurance Company v. Tandingan P.T. P.C. (E.D.N.Y 2022)

• This location is purportedly leased to Macintosh by Hakim Chowdury who provided an affidavit to Geico, now a matter of public record, that he was not affiliated with the facility at the time the lease was purportedly signed. See 20201113 - Hakim Chowdhury Affidavit.

## 4014A Boston

Government Employees Insurance Company v. Ahmed (E.D.N.Y 2022)
Government Employees Insurance Company v. Carewell, Inc. (E.D.N.Y 2022)
Government Employees Insurance Company v. Direct RX Pharmacy Inc. (E.D.N.Y 2019)
Government Employees Insurance Company v. Emmons Avenue Medical Office, P.C. (E.D.N.Y 2022)
Government Employees Insurance Company v. Fialkov (E.D.N.Y 2021)
Government Employees Insurance Company v. Macias (E.D.N.Y 2021)
State Farm Mutual Automobile Insurance Company v. Tandingan P.T. P.C. (E.D.N.Y 2022)

## 420 Doughty

Government Employees Insurance Company v. Fialkov (E.D.N.Y 2021)

## 4250 White Plains

Government Employees Insurance Company v. Ahmed (E.D.N.Y 2022)
Government Employees Insurance Company v. Fialkov (E.D.N.Y 2021)
Government Employees Insurance Company v. Macias (E.D.N.Y 2021)

• In addition, provider Hussein Y Fatima provided and affidavit that billing submitted to USAA from this address purporting to be from Fatima was not performed by or authorized by Fatima.

## 430 W MERRICK RD

State Farm Mutual Automobile Insurance Company v. Tandingan P.T. P.C. (E.D.N.Y 2022)

**513 Church Ave**

Government Employees Insurance Company v. Ahmed (E.D.N.Y 2022)
Government Employees Insurance Company v. Macias (E.D.N.Y 2021)

**599 Southern Blvd**

Allstate Insurance Company v. Conrad Robert Williams, M.D. (E.D.N.Y 2013)
Government Employees Insurance Co. v. Jacobson, D.C. (E.D.N.Y 2015)
Government Employees Insurance Company v. Kalitenko (E.D.N.Y 2022)

**611 East 76th**

Government Employees Insurance Company v. Macias (E.D.N.Y 2021)

**632 Utica**

Government Employees Insurance Company v. Ahmed (E.D.N.Y 2022)
Government Employees Insurance Company v. Carewell, Inc. (E.D.N.Y 2022)
Government Employees Insurance Company v. Cecile I Fray, M.D., PLLC (E.D.N.Y 2019)
Government Employees Insurance Company v. Lexington Medical Diagnostic Services, P.C. (E.D.N.Y 2018)
Government Employees Insurance Company v. Macias (E.D.N.Y 2021)
Government Employees Insurance Company v. Seasoned Chiropractic, P.C. (E.D.N.Y 2018)
State Farm Mutual Automobile Insurance Company v. Tandingan P.T. P.C. (E.D.N.Y 2022)

• In addition, provider Olubusola Brimmo stated that billing submitted to USAA from this address purporting to be from him was neither performed by nor authorized by Brimmo.

**647 Bryant**

Government Employees Insurance Company v. Macias (E.D.N.Y 2021)

**71 S Central Ave**

Allstate Insurance Company v. Dowd, M.D. (E.D.N.Y 2019)
Government Employees Insurance Company v. Carewell, Inc. (E.D.N.Y 2022)
Government Employees Insurance Company v. Macias (E.D.N.Y 2021)
Government Employees Insurance Company v. NYRX Pharmacy Inc. (E.D.N.Y 2020)
Government Employees Insurance Company v. VIP Pharmacy Corp. (E.D.N.Y 2021)

• This address was also used by **Rutland Medical**.

• In addition, provider Hussein Y Fatima provided and affidavit that billing submitted to USAA from this address purporting to be from Fatima was not performed by or authorized by Fatima.

• In addition, provider Olubusola Brimmo stated that billing submitted to USAA from this address purporting to be from Brimmo was not performed by or authorized by Brimmo.

**82-25 Queens Blvd**

Government Employees Insurance Company v. Ahmed (E.D.N.Y 2022)
Government Employees Insurance Company v. NYRX Pharmacy Inc. (E.D.N.Y 2020)

106.    Regarding 3626 Bailey Ave medical provider Hussein Y. Fatima M.D. provided an affidavit swearing that billing submitted to Plaintiffs from this address purporting to be from Dr. Fatima was not performed by or authorized by Dr. Fatima.

107.    Space in 3910 Church Ave was purportedly leased to Macintosh by Hakim Chowdury who provided an affidavit to GEICO insurance company that he was not affiliated with the facility at the time the lease was purportedly signed. (*See* 2020-cv-1113)

108.    Regarding 632 Utica, a provider named Olubusola Brimmo MD stated that billing submitted to Plaintiff from this address purporting to be from him was neither performed nor authorized by Brimmo. In addition, Hussein Y Fatima M.D. provided an affidavit that billing submitted to USAA from this address purporting to be from Fatima was not performed or authorized by Fatima.

**2.    The File Review: A Mélange of Deceit**

109.    Plaintiffs conducted Examinations Under Oath ("EUOs") of patient/insureds. Multiple patients denied receiving at least a portion of the treatment that was billed to Plaintiffs. Patients denied receiving some of the Trigger Point Injections billed by Macintosh. Others denied that Macintosh used Ultrasonic guidance to perform the trigger point injections.

110.    Trigger point injections are quite memorable and if done properly involve the following:

(i) The patient may be sitting or lying down on an exam table.

(ii) The healthcare provider will cleanse the skin on the affected area with an alcohol pad.

(iii) The provider may mark the trigger point with a skin marker.

(iv) Once the provider has identified the trigger point by feeling it, they will pinch the point between their fingers and stabilize the tissue. This will feel uncomfortable.

(v) The provider will insert a thin needle attached to a syringe into the trigger point and rhythmically continue needling the area by repeatedly inserting and retracting the needle without completely withdrawing the needle from the muscle.

(vi) The patient will feel muscle spasm or twitch. The provider will continue the motion in multiple directions until the muscle twitching has stopped or until the muscle feels adequately relaxed.

(vii) The provider will then inject the area with a local anesthetic with or without corticosteroid or botulinum toxin.

(viii) There will be pain. Trigger points are typically painful to the touch, so the pain will be noticeable especially when the healthcare provider is manually locating the trigger point before the injection.   There will be a stinging and burning sensation when the provider inserts the needle and medication. When the tip of the needle touches the trigger point, there is an increase in pain.

(ix)   In the days that follow the injection the patient must avoid strenuous activity.

111.    For claim 041203405-008 an examination under oath of patient MB was performed on 09/21/2021. Macintosh Medical had billed for trigger point injections with ultrasonic guidance on 06/16/2021. MB stated that she only received epidural injections at a surgery center on 08/16/2021 provided by another entity that was not Macintosh.

112.    For claim 022213323-004 examinations under oath of patients SS and CG were taken on 07/19/2021. Macintosh submitted billing for both patients who were allegedly given four (4) trigger point injections each on 05/12/2021. Patient SS explicitly stated that she received only 2 injections. CG stated that he received one or two injections.

113.     For claim 27114516-22, an examination under oath of patient MS was taken on 03/6/2022. MS denied receiving trigger point injections and only remembered receiving injections in Brooklyn (steroid injections at a surgery center). Nevertheless, Macintosh billed for trigger point injections on 12/16/2021 and 01/13/2022.

114.     Claim 037240206-002: Patient KS was treated by Macintosh Medical at 71 South Central Ave in Valley Stream, NY. A location known to be controlled by Lay people (See *USAA v Rutland Medical* 2018-cv-04727 (EDNY) and *United States v Moy* 22-Cr-019 (SDNY)). Billing from Macintosh claimed a new patient examination on 01/12/2022 by Luigi-Martinez. Ultrasound imaging was billed by Concierge Diagnostics and Park Avenue Medical Imaging with a date of service of 01/24/2022. The referral was purportedly signed by Sonia Sikand. In response to our request for verification, Macintosh responded that this referral was "not authentic" but that "all other referrals are authentic." A referral purportedly from Dr. Sikand dated 01/26/2022 (a date when no Macintosh employee treated this patient) requested Transcranial Dopler testing ("TCD") and videonystagmography testing ("VNG") testing which was billed by Unisoft LLC (which entity has no registration with the Office of the Professions and is engaged in the illegal corporate practice of medicine) and Sedation Vacation Perioperative Medicine PLLC. There is no indication in the reports from Macintosh Medical that these services were necessary, that the results were reviewed or that any Macintosh employee requested these services. In fact, the examination by Macintosh showed that the patient denied any neurological symptoms rendering these tests the very quintessence of medically unnecessary.

115.     Claim 017064172-002: Patient MS was purportedly referred by Dr. Sikand for ultrasound diagnostic imaging, VNG testing and TCD on 01/24/2022 and then again on 01/26/2022. The referrals were both on different forms and used to justify the testing, two (2) days

apart by four (4) different medical providers (two (2) each for the Technical component and professional review).

116.    Meanwhile for MS the first bill received from Macintosh was for an alleged visit at 71 South Central Ave in Valley Stream, NY on February 8, 2022.   February 8, 2022, is after the discussed referrals making the referrals fraudulent.   In the 02/8/2022 report, the patient denied neurological symptoms including dizziness which was used to justify the VNG report. The referrals are not listed in the examination plan and the results of the tests are not reviewed in any report by Macintosh Medical.

117.    Claim 023769871-003: Patient LM began treating with Glenridge Chiropractic at 71 South Central Ave in Valley Stream, NY on 11/29/2021. LM was purportedly referred for TCD testing and spinal ultrasound (billed by Concierge Diagnostics) by Dr. Sikand on 12/7/2021. Another referral from Dr. Sikand was dated 12/22/2021 for another TCD (billed by Unisoft). At the time the referrals were purportedly signed by Dr. Sikand, the only examination performed by Macintosh was the initial examination at on 12/3/2021 by Alexander Kopach, allegedly reviewed by Dr. Etienne. The reports do not mention these tests or the need for them.

118.    Four days later a purported referral signed by a Macintosh employee who had never seen the patient was used to justify another spinal ultrasound. Additionally, a referral purportedly signed by Viviane Etienne on 12/23/2021 for shock wave therapy was used to justify billing from Hussein Y Fatima. Fatima has provided an affidavit withdrawing all claims for these procedures stating the provider "…did not provide medical treatment and/or medical services in the State of New York related to any Extracorporeal Shock Wave Involving Musculoskeletal System, treatment nor Transcranial Doppler testing nor Vestibular Caloric testing."

119.   LM was also given psychological testing even though the patient examination contained no complaints of a psychological nature.

120.   Claim 041770546-001: Patient LP also began treating with Herschel Kotkes MD at 71 South Central Ave in Valley Stream, NY on 12/20/2021.   LP began treating with Glenridge Chiropractic on 12/21/2022 and Macintosh medical on 12/23/2021. Macintosh medical performed Trigger Point injections with ultrasonic guidance, outcome assessment testing, and an examination. They also reportedly performed a thoracic/lumbar ultrasound.

121.   A referral from Dr. Sikand was used to justify spinal canal ultrasounds performed by Concierge Diagnostics/Park Avenue Medical Imaging on 12/28/2021. According to Macintosh medical, the referral was "not authentic."

122.   USAA and Garrison also received billing from Dr. Brimmo sent by the Law Office of Akiva Ofshtein for extracorporeal shockwave therapy of LM. The billing was accompanied by a prescription allegedly signed by Luigi-Martinez on 01/3/2022. Dr. Brimmo told USAA that he never performed shockwave therapy on any patient in New York.   Further that he did not authorize any billing in his name. Documentation provided by Dr. Brimmo demonstrates that he did not have a retainer agreement with Ofshtein at the time this billing was submitted and that Brimmo was in no way involved in the treatment at this facility.

123.   Claim 038298258-001: Patient PW began treatment with Macintosh Medical and Able Chiropractic PC at 632 Utica Ave, Brooklyn, NY on 09/13/2021. Macintosh billed for a new patient exam (99204), Outcome assessment testing, and trigger point injections with ultrasonic guidance, all on this first visit.

124.   For the same above Claim (PW 038298258-001) USAA GIC was also billed by Park Avenue Medical Imaging for multiple joint and spinal canal ultrasounds, for Shockwave

Therapy by NY Care PT PC, all for the same above date of service. Records do not indicate the order of the treatment but the referral for Ultrasound lists Su Yeon Jeon NP as the referring physician. There is also a shockwave therapy referral purportedly signed by Dr. Luigi-Martinez. The treatment notes from Macintosh show a prescription for multiple MRI's but nothing in the records indicates spinal or joint ultrasounds, only "ultrasound for biopsy" which is the code billed for the trigger point injection with ultrasound guidance. The records do not mention a referral for shockwave therapy, but they do mention chiropractic, PT, Acupuncture and EMG/NCV. The records indicate no neurological issues and no psychiatric issues.

125.    USAA GIC then received billing for alleged treatment to PW from MW Psychology with a date of service of 9/14/2021 (the next day). The treatment records show that the patient was "self-referred." A letter of medical necessity was written from MW Psychology to Carlotta Ross Distin, another Macintosh employee who never saw this patient, advising that he was seen for a "psychological evaluation and possible treatment due to complaints of psycho-emotional distress form a motor vehicle accident on 9/8/2021... the patient reported experiencing a significant degree of psychological symptoms".

126.    There is yet more for PW: USAA GIC received billing from Wizard Computer Services, an entity not registered with the Office of the Professions and engaging in the illegal corporate practice of medicine, for VNG testing of PW on 09/15/2021. (The lack of neurological problems renders this test incomprehensibly medically unnecessary) The accompanied referral form signature is unreadable and undated. The report is addressed to Carlotta Ross-Distin, a Macintosh employee who never saw the patient. The test report templated and lists "The pt is c/o recurrent episodes of dizziness and headaches." This conflicts with the Macintosh medical examination report from two days prior which reads "Denies...poor coordination...does not

experience any gait disturbance." The report was reviewed by Sedation Vacation Perioperative Medicine.

127.     And the PW saga continues: Billing also indicates that PW received shock wave therapy from multiple different providers including Joseph Raia, Grace Medical Health and others. On 11/29/2021, he allegedly received multiple arthroscopic surgeries performed by William King MD, under anesthesia from Sedation Vacation and on the same day he allegedly received shock wave therapy from Grace Medical Healthcare.

128.     Only two days after the above surgery, Grace Medical healthcare billed for additional shockwave therapy of PW with treatment of Cervical, Thoracic, Lumbar, Right Hip, Left Hip and Right Knee. Billing was also received from Olubusola Brimmo MD for shockwave therapy on 01/24/2022 and 02/2/2022. This physician has told USAA that he was not involved in this treatment and did not authorize the billing. The referral that accompanied the forged/unauthorized treatment records included a referral from Dr. Luigi-Martinez of Macintosh.

129.     For claim 034015313-003: Patient AB began treating with Macintosh medical at 1894 Eastchester STE 201, Bronx NY on 11/29/2021 for an 11/24/2020 accident. Macintosh performed an examination, outcome assessment testing and trigger point injections with ultrasonic guidance. The report indicates that the patient is "undergoing intense Chiropractic, physical therapy and acupuncture treatments." The initial examinations for acupuncture and physical therapy were not until 11/30/2021, the day after the Macintosh exam. On 11/30/2021 AB received psychiatric testing although symptoms indicating the need for such treatment were not mentioned in the Macintosh report or subsequent reports. Billing for VNG (and related) testing was submitted by "Green Power LLC" – which sounds like an entity involved in alternative energy sources – which entity is not registered with the Office of the Professions and is engaged in the illegal

corporate practice of medicine. (Not only are they not entitled to reimbursement, but Green Power is engaged in E Felony Offenses) The billing included a referral prescription for TCD and VNG testing signed by Viviane Etienne.

130.     For claim 051979248-001: SM began treating at Standard Care PT PC on 11/30/2021 and then at Vista Care PT PC on 12/1/2021 both located at 647 Bryant AVE, Bronx, NY after an 11/05/2021 loss. This therapy began prior to the patient seeing a Medical Doctor. Billing was also received for this member under claim 036642589-003. SM first treated with Macintosh on 12/06/2021 at the same address. The examination report was signed by Sonia Sikand PA, and Viviane Etienne MD. Macintosh allegedly performed outcome assessment testing, an examination and trigger point injections with ultrasonic guidance on this first visit. The report states that the patient is "undergoing intense chiropractic, physical therapy and acupuncture treatments." This excerpt was taken from the outcome assessment report completed by the patient on the same day which totally contradicts the report of the examination signed by Sonia Sikand PA and Macintosh Medical Director Viviane Etienne MD:

6.   Which of the following helps ease your upper or mid-back pain?

☐ physical therapy     ☐ acupuncture     ☒ medication     ☒ rest     ☐ chiropractic

☑ Haven't started any of the above treatment.

131.     The Macintosh examination report lists no neurological or psychological symptoms (SM was seen by a psychologist on the same day but there is no evidence of a referral). There is no mention of shockwave therapy in the treatment plan, but this treatment was billed by Sangheet Khanna beginning on 12/07/2022. The billing was submitted by Korsunskiy legal group and

included a purported referral for Shockwave Therapy from Mario Leon (Macintosh employee). Counsel for Macintosh specifically identified the referral as "not authentic."

132.    Billing records show that on 12/08/2021, SM received TCD testing, Sinusoidal vertical axis rotational testing, VNG testing, caloric vestibular testing and related tests performed by Unisoft LLC (which is not registered with the office of the professions and is illegally engaged in the corporate practice of medicine – E Felony). The tests were purportedly reviewed by Sedation Vacation Perioperative Medicine PLLC. The "Neurological Referral Script" which accompanied the bills, again sent by Korsunskiy Legal Group, listed Mario Leon as the referring provider. This referral was identified as "not authentic" according to counsel for Macintosh Medical.

133.    And it continues for SM: Billing was received from Concierge Diagnostics for multiple ultrasound scans allegedly performed on 12/15/2021. This referral was also allegedly signed by Mario Leon. The scans were not mentioned in the Macintosh treatment plan which according to Macintosh's own counsel indicates that they are prima facie fraud.

**3**.    **The Remarkable Examination Under Oath of Jonathan Landow MD**

134.    On Wednesday April 6, 2022, Dr. Landow appeared for an Examination Under Oath ("EUO") on behalf of Macintosh Medical. Dr. Landow testified that he was the owner Macintosh Medical since inception in 2002.   He specializes in Internal Medicine/General Practice. He has no board certifications.

135.    Landow appeared remotely from his home in Florida.   He claims that he supervises the medical treatment of patients at dozens of offices in the New York City Metropolitan area from Florida.

136.    Landow could not name all the offices from which his alleged practice renders services.   In fact, he testified that he must keep an updated list.

137.     Landow testified that he remotely (telephonically) meets with Staff every other Monday and used quite a bit of puffery to describe these meetings.   He testified that every member of his clinical team is invited and encouraged to participate; although they do not all participate. The meetings last 30-45 minutes and they are "didactic", part Q&A" and sometimes "an interesting case would be discussed."

138.     The professional staff includes Medical Doctors, PA's NPs and a couple of "admins."   Medical doctors included Etienne, Chris Durant, Dr. Luigi-Martinez and Dr. Landow.

139.     Nothing prohibits his staff from working for other entities.

140.     Landow gave half-hearted testimony to the effect that sometimes he sees Macintosh patients telephonically. But he has no telehealth platform. He would use his cell phone for any telehealth visits. However here is where this testimony became weak: Landow testified that has not submitted a single bill to USAA for a telehealth visit making his incredible claims of activity exceedingly irrelevant.

141.     Landow confirmed that Macintosh is not a "free standing" medical practice. Instead Macintosh appears at other multidisciplinary clinics to render its purported services.

142.     Landow testified that he gains access to these various clinics and their patients in the guise of "license and service agreements" which were prepared for Landow by a law firm or lawyer called "Norton Travis … quite a few years ago."   Landow testified that the clinic had to agree to his specific agreement before he would open shop there.

143.     According to Landow his role in picking a location was looking at it online although many of these locations do not even have websites.   The most important aspect of deciding on whether to offer services at a clinic would be the opinion of his "Director of Operations" –

according to Landow the name is spelled "Kanny K-a-m-r-u-n-a-h-a-r."  According to payroll records the name is spelled Kanny K-a-m-r-u-n-n-a-h-a-r.

144.    We have no idea how much this layperson Kanny is paid because the amount was "whited out" by Landow's handlers.

145.    Kanny would "go out there and meet with the leadership group at the office and spend a little time observing."  According to Landow in picking a clinic they were looking for people that wanted to deliver "quality medical services … not just by us, but by other people that might be practicing alongside of us."

146.    Landow further testified that the second criteria in deciding on a clinic is that the clinic is "you know, a compliant and well-organized medical office."

147.    According to Landow rent is a sliding scale based upon "fair market value."  Fifty percent of the rent is based upon the quality and quantity of space and the other fifty percent is based upon "the personnel and access to a turnkey office."  According to Landow there is a cap to how much they will pay with a $2,500.00 dollar maximum.   Landow's providers will be present at a clinic about one day per week.

148.    Landow's attorney objected to questions regarding finances at the examination and financial documents in additional verification requests.

149.    According to Landow the front desk of the clinic schedules and confirms patients, gathers insurance information and other demographics. "It's important that we have people at the front desk, you know greeting patients when they walk in, having them fill out forms and sign-in sheets, things of this nature, so that is what it's really designed for."

150.    Landow testified that Macintosh is strictly dependent on referrals of patients from the clinics [which can only mean the layperson front desk]

151.    According to Landow Macintosh is at the facilities in three capacities 1. Orthopedic; 2. Pain management; 3. Primary care (internal medicine).

152.    Orthopedic evaluations would generally be based upon the referral from another provider.   If a patient is deemed a surgical candidate, the surgery would be performed by a Dr. Durant on behalf of Macintosh. Landow had no idea where Durant had admitting rights but stated that it did not matter because this was outpatient surgery.   But Landow could not recall what out-patient surgery centers were used – "All something, all city, something of that nature."

153.    The pain management practice focuses mainly on therapeutic injections including injections with ultrasound guidance.   Certain chemicals are injected in what is known as a trigger point in the body – an area of painful spasm.   These chemicals consist of "lidocaine, xylocane, prilocaine, things of that nature."   "If that is not working and need something more robust, then they would need to go to a surgery center to receive other types of services … spinal injection under fluoroscopic guidance like epidurals or radio frequency ablation."

154.    Radiofrequency ablation (RFA) uses heat to destroy tissue – radio waves are sent through a precisely placed needle to heat an area of the nerve quite literally destroying it – burning it up. This prevents pain signals from being sent back to the brain. RFA is considered for long-term pain conditions, especially of the neck, lower back or arthritic joints.

155.    Landow further testified that there are "percutaneous disectomies, procedures that are more invasive for sure." Destroying nerves would appear to be invasive but a percutaneous discectomy consists of an endoscopic (small tube) inserted through a small incision in the skin, between the vertebrae and into the middle of the disc. The endoscope has a camera that allows the doctor to see inside the body.   Surgical tools are inserted through the tube, or a series of tubes.

The surgeon removes disc tissue by either: (i) Cutting out the entire disc; (ii) sucking out the center of the disc; (iii) using lasers to burn or destroy the disc.

156.    According to Landow the therapeutic medications are stored with Kanny in Queens at her home office.

157.    During the EUO, Dr. Landow was questioned about referrals for testing, such as diagnostic ultrasound, Videonystagmography ("VNG") testing and Transcranial Doppler ("TCD") testing.   Landow quite unaware of what was going on in his practice testified that these tests were almost never medically necessary for no fault patients.

158.    Landow was then shown referrals from medical professionals at his practice for these very procedures. Landow suggested that his employees' signatures were being forged.   He expressed outrage.

159.    Landow waxed philosophical about Extracorporeal Shock Therapy for pages indicating that his own providers were currently studying the use of it.   In Post EUO Additional Verification his attorney even stated that for now Macintosh had rejected its use.   Furthermore, this was not a treatment that they would refer out.   Yet Landow was shown a bill for shock treatment by Headlam Medical Professional Corporation who Landow had no knowledge of. The bill was submitted by the law firm of Abrams Fensterman – which firm pioneered No Fault "funding."   Most importantly the referral came from Macintosh's own Luigi Martinez MD. Landow denied that his doctor or Macintosh made the referral.

160.    Landow opined that someone stole Martinez's signature and put it on a referral form that he did not recognize as belonging to Macintosh.   Landow has not performed this procedure and Macintosh does not own any equipment for this. It became "more common in this

calendar year [for his physician employees to refer patients for ECSWT]". He received brochures – which will be discussed *infra* – about ECSWT but never met with anyone to discuss it.

161. Initially Landow's testimony exhibited haughty embellishment when he testified that he – Landow – "on a qualified basis" approved the referral process for ECSWT. Landow and his staff are "agnostic to the point of being disinterested about who does it as long as they do it correctly." (That is the biggest understatement surely ever uttered)

162. Landow testified that he did not vet any ECSWT providers. His employees did not vet any ECSWT providers. Landow further testified that to the best of his knowledge, the procedure takes place within a Macintosh office at the clinic. He believes a service provider comes in to do the therapy. He doesn't know the names of any of the providers.

163. Landow testified that his employee medical providers had ultimate autonomy and are tasked with determining what is medically necessary like a prescription or referral.

164. Landow reviewed the referral for patient KE to Dr. Riaz for ECSWT (extracorporeal shock treatment) and found it "suspicious." The referral was purportedly made by Macintosh employee Emmanuel Luigi-Martinez MD. As to the signature Landow testified: "It looks a little different and could be copied several times. The resolution is – I am suspicious."

165. Landow was asked if he recognized the referral form as emanating from him, his staff or Macintosh as he had discussed prior. Landow testified thusly: "No." Landow in response to another question expanded upon his answer:

> I am not even aware that we have a formal prescription that looks anything like this. I was – yes, so I am going to take a deeper dive into this at the conclusion of the Examination Under Oath because you have more than piqued my curiosity here.

Landow's curiosity may be "piqued" but USAA is stuck with a very large fraudulent bill.

166.     Landow demanded that the image of the referral be enlarged such that he could take a screen shot of it.   Then Landow blurted out:

> Tony [his counsel] will probably kill me, but I did learn, thanks to another insurance company, that there seem to be people making checks payable to Macintosh Medical, and then party B takes the check to a cash-checking facility in New Jersey, and we never know about it because it doesn't involve us.

167.     The referral scheme is so pervasive that Macintosh's hands on providers refer acupuncture and chiropractic treatment for every patient.   First an acupuncturist and chiropractor need no referral – these treatments are patient self-referred. Secondly an orthopedic evaluation would normally be loath to refer for treatment in areas of medicine that are alien to orthopedics.

168.     Landow was asked if he was familiar with Transcranial Doppler Testing ("TCD"). He responded, "a little bit."   He stated that his providers would not be making referrals for this procedure, but he could not "swear for every single patient."   Furthermore, he never had discussions about TCD with his staff and was not aware of a single referral.   In fact, Landow testified that as a general matter with the patients that Macintosh was seeing there would be no need for TCD.

169.     Landow was shown a referral for TCD from one of his verified provider employees Emmanuel Luigi-Martinez MD. The referral contained what purported to be the signature of Martinez. Landow acted as if he was seriously taken aback.   Landow stated that no Macintosh employees were at the location from which the referral emanated on the date indicated on the referral.   He further stated that Martinez never worked at that clinic – "Bailey Avenue" – "it was always PA Carlotta Distin."   Further Landow disavowed knowledge of the entity that purportedly provided the service – "Green Power New York, LLC" (which is not even a medical professional

entity and therefore not authorized to submit medical billing). Landow further disavowed knowledge of Green Power's alleged owner Konstantinos Koutelos.

170. Next Landow was asked if any of his medical providers referred patients for Musculoskeletal Ultrasound. He denied such.

171. He was then asked if he had ever heard of Bitachon Diagnostics, Inc. – again not a professional medical entity. He denied any knowledge of this entity.

172. Landow was shown the bill for a Musculoskeletal Ultrasound Service emanating from Bitachon Diagnostic Inc. He once again denied that any of his medical providers would make such a referral.

173. Landow was then shown a referral from Macintosh to Bitachon Diagnostics Inc. for the above Musculoskeletal Ultrasound that emanated from his alleged medical doctor – Alexander Kopach MD – "a long-standing employee." Landow testified that Kopach was not a medical doctor but "only a PA."

174. The above bill and referral were submitted by medical funding connected attorney Dennis Korsunskiy of the Korsunskiy Legal Group. Landow knew this firm stating that they represented him in arbitrations.

175. In the end Landow stated that he never discussed Musculoskeletal Ultrasound and he did not create the referral form. Landow hoped that Kopach did not create the referral.

176. Landow was shown another ultrasound bill from Concierge Diagnostics Inc. – again not a medical professional corporation. He testified that he did not recognize the referral form, but it did contain the purported signature of one of his nurse practitioners. Landow again stated that he never had discussions with his staff about this type of service or Concierge Diagnostics Inc.

177.   In response to all of the above Landow stated to Plaintiff's representatives: "I am as appalled as you are.   Maybe more so."   However, Landow is not stuck with the fraudulent bills.

178.   But there was more. Landow was shown billing sent by Korsunskiy Legal Group from Wizard Computer Services, Inc. – again a non-medical professional entity that is forbidden to practice medicine in the State of New York – for Caloric Vestibular testing that was referred by Macintosh via Carlotta Ross-Distin PA.   Landow testified as to the rarity of this testing and the total absolute lack of medical necessity.

179.   Landow testified that the managers at the clinics he was operating at had access to all his medical files via a password.   He opined that perhaps they were behind this forgery and fraud because in his immortal words this would be "something that was done for profit."   He promised to get to the bottom of all of it.

180.   Plaintiffs have a multiplicity of this type of billing that emanates from Macintosh referrals.   When USAA attempted to get to the bottom of all of this by requesting the EUOs of Distin; Kopach and Martinez – the purported authors of the referrals – Landow's counsel vehemently objected.   Examinations Under Oath were noticed and scheduled for the above medical providers anyway but they were no shows.

181.   Finally, Landow claimed to be chagrined to learn that he was referring patients to Rob Alon owner of Med Aid Radiology for MRIs.   Med Aid is located in the State of New Jersey. Alon is not a medical doctor or any type of medical professional.   Landow testified that he knew Alon as someone who was involved in extensively marketing medical providers but not as the owner of an MRI facility.   Landow testified that he did not authorize the referrals.   Landow was

asked why a patient that resided in New York was referred to a facility in New Jersey for MRIs. Landow testified: "I have no clue."

182.    Macintosh also refers Durable Medical Equipment ("DME") to patients, but Landow was unclear as to what that entailed.   He testified that Macintosh would "only recommend it" but would "not procure it or distribute it."   According to credible allegations in prior litigation Macintosh's DME prescriptions were fraudulent.   Said prescriptions were purchased via illegal referral payments. With the subsequent EUO of Landow this issue will be further expanded.

183.    Macintosh prescribes what is commonly known as compounding ointment or cream wherein the active ingredient is lidocaine.   It is extremely expensive and can cost into the thousands of dollars.

184.    Landow testified that the ointment would be ordered by Macintosh through a computer portal and then delivered either to the patient or the clinic.   This is the common way that fraud occurs.   In many instances the patients are not even aware of the fact that an extremely expensive prescription has been filled and billed to their insurance because the ointment is sent to the clinic and the patient never receives it.

185.    Also, this is the type of prescription that generates large illegal cash referral payments from pharmacies given the high cost.   It is rubbed into the affected area and rarely medically necessary.   Furthermore, there are serious contraindications such as anaphylactic reactions and methemoglobinemia.

186.    Anaphylaxis is a severe, potentially life-threatening allergic reaction. It can occur within seconds or minutes of exposure to something a person is allergic to.   Anaphylaxis causes

the immune system to release a flood of chemicals that can cause shock wherein blood pressure drops suddenly, and the airways narrow, blocking breathing.

187.    Methemoglobinemia is a potentially fatal condition that occurs when the ferrous iron of heme is oxidized to ferric iron, causing decreased capability of hemoglobin to deliver oxygen.

188.    Landow vaguely testified about "funding."   He testified that he received funding from "DLF."   But he did not know what DLF stood for: "I just know them as DLF, diversified something funding.   They're based in Manhattan."   He did not know much about the mechanism other than stating: "There is a rather voluminous agreement that describes what is an eligible claim, and then they will advance as a loan a percentage of that claim."   He testified that he began the funding in 2020.

189.    DLF stands for Dynamic Legal Funding which is a Manhattan based entity that funds personal injury plaintiffs and – in a gruesome twist – surgical procedures for plaintiffs involved in personal injury actions.   The word "gruesome" is born out of the fact that surgeries are often performed to enhance the value of a personal injury suit even if not medically necessary. Legal funding entities have been transitioning into no fault claim funding.

190.    If Landow truly owned his practice he would have been a lot more knowledgeable about his funding agreement.

191.    Once funding agreements are entered into layperson owners of medical entities will simply create billing material for treatment that was never rendered.   This is electronically transmitted to the "funders" in order to get the up-front cash.   The multiplicity of billing discussed above is consistent with the above.

192.    The purchase of claims by layperson is sine qua non layperson ownership and control of a medical provider by the funder.   It motivates treatment rather than medical necessity.

193.    We have discussed admitted fraudulent services that are based upon forged referrals or referrals of unknown origin: up-front cash for paper claims has acted like jet fuel to the generation of fraudulent claims.   To that end the suspect billing is being submitted by such law firms as Abrams Fensterman; Akiva Ofshtein and The Korsunskiy Legal Group (Korsunskiy himself gave the identity of multiple funders to counsel for GEICO) All three law firms are heavily connected to funded providers.

194.    Furthermore, Landow testified that he retained a billing company called GreenBills who creates bills by accessing the electronic database where all the medical documentation is scanned and stored – "they're able to pull out the necessary information to generate a bill, which would include all of the demographics, CPT codes, ICD-10s, et cetera."   According to Landow GreenBills "has multiple names and is a billing platform and software program that they developed, so we have a licensing fee to access their system."   GreenBills costs Macintosh approximately $10,000 dollars per month.

195.    According to GreenBills website:

GreenBills is a specialized EMR, Practice Management and Medical Billing & Collections services company focused on streamlining workflows for PIP, No-Fault and Workers Compensation professionals.

https://greenbills.com/software/

196.    GreenBills boasts testimonials from such well-known no fault fraud players as Yan Moshe (Moshe has been the key Defendant in multiple federal RICO suits; was the subject of stiff fines levied by the State of New Jersey for unsanitary conditions at one of his ambulatory surgical

centers; and most bizarrely the New Jersey health department has fined Moshe owned Hudson Regional Hospital $63,000.00 after police discovered a stockpile of 39 firearms – including an illegal assault rifle with a high-capacity magazine – stashed in an unlocked hospital closet)

197.    GreenBills is located at 7122 Bay Parkway, 2nd Floor, Brooklyn, New York 11204. It is a two-story building in Bensonhurst and two stories only.   The sign for the top floor says: "Parkway Drivi g S hool" [sic – there are missing letters].   The sign for the first floor announces: "Home Family Care."   GreenBills is a sham company.

198.    Billing companies are a traditional means of siphoning money from medical entities to their layperson controllers.

199.    After this extraordinary EUO USAA had an off the record conversation with the attorneys present. USAA explained that they took issue with patients being treated by unknown persons working for unlicensed entities and referrals at numerous locations all purportedly coming from Macintosh employees for Macintosh patients. USAA explained that they needed to know if the referrals were authentic. If not, they would need affidavits from the various employees. If the referrals were authentic, USAA would need an explanation about the referral process and who is vetting the providers, etc. Landow's counsel stated they would work with USAA on this request.

### 4.    <u>The Response to the Post EUO Request for Additional Verification</u>

200.    On or about 06/15/2022 USAA received a response to their Request for Post Examination Under Oath Additional Verification. Included in the response was a statement that many of the referrals submitted as examples were "not authentic."

**Sonia Sikand:**

- Aorta Duplex with ultrasound referral for [KS 037240206-002] dated 1/24/22 is not authentic.

- Aorta Duplex with ultrasound referral for [LP 041770546-001] dated 12/28/21 is not authentic.
- All other referrals are authentic.

**Viviane Etienne**:

- Shockwave referral for [AB 034015313-003] 11/29/21 is not authentic.
- VNG referral for [AB 034015313-003] dated 12/2/21 is not authentic.
- Shockwave referral for [RM 032429277-011] dated 11/30/21 is not authentic.
- Shockwave referral for [SD 032429277-011] dated 11/16/21 is not authentic.

**Mario Leon**:

- Ultrasound referral for [SM 051979248-001] dated 12/15/21 is not authentic.
- VNG referral for [SM 051979248-001] dated 12/8/21 is not authentic.
- Shockwave referral for [SM 051979248-001] dated 12/7/21 is not authentic.
- All other referrals are authentic.

**Hiram Emmanuel Luigi-Martinez:**

- VNG referral for [LH 034994015-004 611 E 76th St Brooklyn] dated 2/27/21 is not authentic.
- VNG referral for [SS 052274933-001 3626 Bailey Ave] dated 2/28/21 is not authentic.
- VNG referral for [TD 034022049-024 3626 Bailey Ave] dated 11/9/21 is not authentic.

**Jeon Sue Yeon**: All referrals are authentic.

**Carlotta Ross-Dintin**: All referrals are authentic.

**Alexandr Kopach**: All referrals are authentic. (Which contradicts Landow's own testimony)

201.  The referrals that were deemed "authentic" by Macintosh in their response to additional verification were just as fraudulent as the referrals they deemed "not authentic." They were often used in other fraudulent billing schemes including physician identity theft. Moreover the "authentic" Macintosh referrals were not supported by the referring physician's examination

notes and results of the experimental tests were not mentioned in future examinations by Macintosh's alleged medical professional employees who purported to examine the patients.

202. Some of these "authentic" referrals were made before the referring medical professional ever saw the patient – which is impossible.

203. In addition, nearly all the patients received the same regimen of treatment from Macintosh medical provider employees. In some cases, the patients denied even receiving treatment billed by Macintosh.

204. Yet Macintosh's response begins by accusing USAA of "abusive and vexatious requests [that] are simply a pretext for red-tape dilatory practices or sheer claims avoidance."

205. Amongst the highlights Macintosh stated that they did not understand USAA's request for information as to whether a referring medical employee was present at a clinic location on the date a specific referral was allegedly made from that location.   USAA referred to the EUO transcript wherein Landow was able to do just that with the information he had in front of him at his Florida home.   USAA received no response.

206. USAA received a list of managers at 25 of the clinics – a mere fraction – wherein Macintosh purports to operate.   Each one of the 32 names provided – some locations had more than one manager – consisted of first names only.   Names like: "Lulu;" "Nunu;" "Vanity;" etc.

207. Macintosh objected outright to the request for the "line of credit agreement" with a page and half of single-spaced inapplicable case law.   They attempted to immunize the agreement by maintaining that they would provide the contract if USAA would "execute a non-disclosure agreement."   As such USAA would arguably be unable to use the document in these proceedings.

208. Landow testified that he had read brochures and literature concerning Shockwave Therapy. USAA requested those publications. What USAA received only highlights the

dissembled nature of Landow, Macintosh and the entire scheme. This is the literature that Landow purported to study regarding the feasibility of using Shockwave Therapy in order to treat automobile accident patients:

(i)   *Extracorporeal shock wave therapy for treatment of vulvodynia: a prospective, randomized, double-blind, placebo-controlled study* (Abstract doi: 10.23736/S1973-9087.20.05903-1. Epub 2020 Jan 14.)

This abstract is highly inapplicable inasmuch as "Vulvodynia" is a non-accident related condition involving chronic pain or discomfort to and surrounding the areas attendant to the opening of the vagina.

(ii)   *Focused Shockwave Treatment for Greater Trochanteric Pain Syndrome: A Multicenter, Randomized, Controlled Clinical Trial* (Abstract doi: 10.2106/JBJS.20.00093)

This abstract is high inapplicable because Greater Trochanteric Pain Syndrome is hip bursitis that is caused by repetitive overuse.

(iii)   *Efficacy of Extracorporeal Shock Wave Therapy for Lateral Epicondylitis: A Systematic Review and Meta-Analysis* (Abstract doi: 10.1155/2020/2064781.eCollection 2020.)

This abstract is highly inapplicable because Lateral Epicondylitis is the none other than "tennis elbow" which is caused by repetitive use like tennis and not a traumatic collision.

(iv)   *Extracorporeal shock wave therapy versus other therapeutic methods for chronic plantar fasciitis* (Abstract DOI: 10.1016/j.fas.2018.11.002)

This abstract is highly inapplicable because chronic plantar fasciitis is inflammation of tissue at the heel of the foot caused by excessive walking and not traumatic impacts.

(v) *Extracorporeal Shock Wave Therapy for the Treatment of Osteoarthritis: A Systematic Review and Meta‑Analysis* (Abstract DOI: 10.1155/2020/1907821)

This abstract is highly inapplicable because as we all know – those of us 50 and older – Osteoarthritis is a degenerative joint disease caused by wear and tear occasioned over the years.

(vi) *Efficacy of extracorporeal shock wave therapy for knee tendinopathies and other soft tissue disorders: a meta‑analysis of randomized controlled trials* (Abstract DOI: 10.1186/s12891-018-2204-6)

Once again, this abstract is highly inapplicable because knee tendinopathies are generally found in athletes whether competitive or recreational and is generally caused by repetitive overload of the knee.

(vii) *The Effectiveness Of Radial Extracorporeal Shock Wave Therapy In Patients With Chronic Low Back Pain: A Prospective, Randomized, Single‑Blinded Pilot Study* (Abstract DOI: 10.2147/CIA.S224001)

Of all the literature purportedly used to study Shockwave Therapy this is the only one that may have some relevance in that chronic lower back pain is usually caused by arthritis as opposed to automobile accidents but it can be caused by disc herniations which can be caused by automobile accidents.

209.   At number 8 of the Request for Post Examination Under Oath Additional Verification the following was requested:

Confirm whether a Macintosh Medical employee referred each of the patients (listed by claim number and patient name on Attachment A), to the corresponding provider and/or for the corresponding procedure listed for that patient.

■ If the patient was referred by a Macintosh employee, please explain the referral process including what format is used, how the referral is transmitted, how the

providers are vetted, and whom the referring provider communicates with to affect the referral and,

■ In the case of entities that are not professionally licensed, (listed as attachment D) please confirm who provides direct professional oversight of the patient treatment?

210.    Macintosh's response did not engender any confidence in the ethics or efficacy of Macintosh's practice.   Macintosh responded thusly:

The carrier is already in possession of every medical record for the claimants listed in Attachment A). These medical documents confirm, where the care plan is plainly listed on the evaluation, the treating provider referred that patient to the corresponding provider and/or for the corresponding procedure listed for that patient. If the care plan is plainly recorded in the evaluation, the referral is authentic.

This is yet further admission that many referrals are not "authentic" inasmuch as in only those referrals where the care plan is "plainly recorded in the evaluation" – whatever that bit of vagary is supposed to mean – does Macintosh purport that the referral is "authentic."   None of the experimental procedures in any of the referrals are mentioned in the care plans so they are all bogus according to Landow's response.   Further as we have seen herein no matter what is contained in the "evaluation" the referral cannot be authentic for reasons such as the purported referrer never saw the patient.

211.    The second part of Macintosh's response explains why the referrals are not "authentic:"

**A) If the patient was referred by a Macintosh employee, please explain the referral process including what format is used, how the referral is transmitted, how the providers are vetted, and whom the referring provider communicates with to affect the referral and,**

Each referral is given to the provider with the patient chart. This includes a blank referral for MRI, DME and any other referred testing. After the provider evaluates the patients, they sign in the referral that is needed and are directed to add this referral in their notes

under plan. The evaluation and the findings are entered in the EMR physical report, and the provider decides accordingly which testing and which referral to sign for the patient. *The referral, if applicable, is communicated with the office staff (not Macintosh staff), the office staff (not Macintosh staff) are the ones giving this document to another provider who is performing the referred service.*

(Emphasis added)

212.    Here Macintosh states that they give referrals that are signed by their "providers" (medical professional employees) to layperson clinic management who then gives the referral to "another provider" – sells the referral to the alleged provider.   Further there are blank referrals that can simply be filled in by anyone at the clinic.   Landow testified that the clinic staff has access to even his electronic record database.   This is an abdication of control over the medicine by Macintosh to laypersons.

213.    The final part of Macintosh's response further demonstrates the fraudulent scheme:

**B) In the case of entities that are not professionally licensed, (listed as attachment D) please confirm who provides direct professional oversight of the patient treatment?**

Macintosh is not aware of these entity names, nor are they acquainted with which entity the clinic uses for their other services done at the clinic. Only medication is sent through the EMR, and for that reason Macintosh is only aware of which pharmacy is used with each clinic.

214.    "Attachment D "contains a list of unlicensed alleged medical providers who are ineligible to practice medicine as they are not professional entities registered with the proper licensing authorities (Office of the Professions) (in fact the practice of medicine by these entities violates the law) These entities have billed USAA for a multitude of alleged services that by their very nature are suspect.   These entities are: Wizard Computer Services, Inc; Green Power New York LLC; Concierge Diagnostics Inc.; Unisoft LLC; Bds Diagnostic Corp.; Cardionostic Inc.;

Opp Rapid Diagnostics Inc.; Isa Prompt Diagnostics Inc.; Adv Diagnostic Inc.; Bitachon Diagnostics Inc.; Titan Diag. Imaging Inc.; Prometheus Image, LLC.

215.    The very names of these entities – the lack of a denotation of "Professional" such as "P.C." (Professional Corporation) or "PLLC" (Professional Limited Liability Company) – demonstrates the illegality of such entities practicing medicine.

216.    Although the above non-professional entities sent a multitude of bills to USAA all based upon referrals from Macintosh in their response Macintosh simply states: "Macintosh is not aware of these entity names, nor are they acquainted with which entity the clinic uses for their other services done at the clinic."

217.    At paragraph 10 Macintosh responding to a list of patients that received Shockwave therapy referrals – approximately 500 referrals – from Macintosh stated:

> It is confirmed the Macintosh team referred the patients listed in Attachment C for the corresponding treatment.

This contradicts the embarrassing exchange that occurred at the April 6, 2022 Examination Under Oath.  This was briefly touched on *supra*.  The questions, documents and responses dealt with the multitudinous treatment given to patient K.E.

218.    Regarding K.E. Landow was shown a bill for Shockwave therapy from a Doctor Riaz for treatment allegedly performed on October 26, 2021.   The bill was submitted by the law firm of Akiva Ofshtein. The referral purports to have come from Macintosh employee Hiram Emmanuel Luigi Martinez MD.  Landow testified that the signature did appear to belong to Martinez – "I am suspicious" – and further that the referral form did not emanate from his practice.

219.    Later in the Examination for patient K.E. Landow was shown yet another bill for Shockwave therapy treatment.   This time it was purportedly performed by Headlam Medical

Professional Corporation on September 30, 2021.  Landow had no knowledge of who or what Headlam was: "Are they also doing the shock wave therapy?"   The bill was submitted by the law firm of Abrams Fensterman which firm is in the middle of multiple investigations for improper treatment funding. The referral purports to once again have come from Macintosh employee Hiram Emmanuel Luigi Martinez MD.   Landow denied that his doctor or Macintosh made the referral. Landow opined that someone stole Martinez's signature and put it on a referral form that he did not recognize as belonging to Macintosh.

220.    Further in their Second Response to Post Examination Under Oath Additional Verification Requests dated July 1, 2022, Macintosh stated:

> As further evidence of this providers quality healthcare practices, we are providing notice that after an exhaustive and comprehensive medical trial spanning many months, the provider has decided to not pursue any shockwave therapy, vestibular caloric testing or transcranial doppler procedures. Nor will any referrals for these procedures be coming from this provider.

221.    Considering the literature that Doctor Landow purportedly reviewed regarding Shockwave Therapy as discussed above and contained in the Response dated May 26, 2022 the above is disingenuous.

222.    Despite all the above in their May 26, 2022 response to Post Examination Under Oath additional verification Macintosh states the each of the approximately 500 referrals for Shockwave therapy are "authentic."   This response even deems the referrals for K.E. that Landow vehemently disavowed in his Examination Under Oath as "authentic."   Further, this response deemed referrals to medical professionals who swore they never billed USAA for Shockwave Therapy as "authentic."

223.    As already recounted Macintosh admitted many of their referrals – ranging from shockwave, VNG testing and ultrasounds – were "not authentic" at Response # 9.   In fact, with patients S.M., A.B., R.M. and S.P., response #9 deems the referrals as "not authentic" wherein response #10 deems those same referrals as authentic.

224.    In the ultimate act of self-incrimination Landow at his May 2, 2023 Examination Under Oath for Atlantic Medical & Diagnostic, P.C. swore that he never saw the above discussed May 26, 2022 response to Post Examination Under Oath Additional Verification.   "Obviously former counsel didn't do a very good job of keeping me informed," said Landow.

225.    Landow testified on May 2, 2023 that he never even saw the transcript of his Examination Under Oath of April 6, 2022.

226.    The above leads to the inescapable conclusion that Macintosh's attorneys consulted with the true owners of Macintosh and not Landow during the entire lengthy verification process.

**5**.    **The Visit to a Macintosh Location**

227.    On 06/2/22 two members of USAA's Special Investigative Unit visited the troubled 71 S. Central Ave, Valley Stream NY location wherein Macintosh purports to operate.

228.    The location has a main front entrance facing S. Central Avenue in the center of the building and a separate entrance on the right-hand (looking at the building) corner of the building with signage that reads "Rehabilitation Center, Chiropractic, Physical Therapy, Acupuncture."

229.    The investigators asked to speak with the individuals who provide VNG testing and ESWT (Shockwave).   The receptionist stated that the techs were not in.   She confirmed that RMA Billing & Collections set up the tech's schedules and handles all their billing. She said that the only contact she has for RMA is an email address "rmabilling1850@gmail.com." Initially she

did not want to provide a name of a contact person at RMA but then confirmed either Irina or Rita are the contacts.

### 6.     Further Wiretap Information

230.    Affidavits for wiretap and wiretap extensions in *US. v. Rose (and Nathaniel "Nat" Coles)* (19-cr-00789) disclosed that the criminal defendants were recorded discussing illegal referral payments for bringing patients to specific clinics some of which were affiliated with Landow.

> we have learned of a list of the clinics in the five boroughs of the City of New York, which Coles uses in order to refer victims to other clinics that are presumably closer to their residences, as opposed to the clinic at 2 Wilson Place. Specifically, we have learned of the Coles' new clinic called S.A. P.T. P.C. at 322 E. 149th St., .2nd Floor, Suite 200, Bronx, NY, as well as Rutland Medical clinic at 145 East 98th Street, Brooklyn, NY ...

> On August 23, 2016, Coles' opened a new clinic at 149th Street in the Bronx. That morning Coles sent out texts to telephone numbers 646-306-0172, 914-800-5457, and 718-924-5416, stating "S.A. P.T. P.C .. 322 E. 149th St.2nd floor Suite 200.Bronx NY 10451" and "New place use it[.] Additionally, during a conversation with Mina on that same day, Mina asked Coles if he had sent her something about a "new place." Coles told her "yes, on 149th Street, instead of using that one on that you use on Third Avenue." Coles told her not to send anything to the Third A venue one and to send it to 149th Street if there was "anything close down that area (presumably meaning any patients close to that area).

231.    Landow submitted his purported lease agreement with SA PT PC to lease space at 322 E 149th Street in the above Macintosh Response to the Post Examination Under Oath Request for Additional Verification dated May 26, 2022.   In addition, Macintosh took over for Rutland at several locations.

### B.  THE BALEFUL REPLACEMENT OF MACINTOSH BY ATLANTIC

232.    Beginning on 07/22/2022, USAA began receiving bills from Atlantic Medical & Diagnostic PC, TIN 11-3461432. This entity is also owned by Dr. Landow and at first blush

appeared to be taking over the locations formerly billed by Macintosh Medical, PC which was later confirmed.

233.    The billing submitted by Atlantic was consistent with the billing pattern seen with Macintosh Medical in that Atlantic billed Examinations, Outcome Assessment Testing and Trigger-Point Injections for all or nearly all the patients they treat.

234.    They also took over the purported treatment of patients formerly seen by Macintosh Medical. For example, with claim number 043616151-001-000, Patient D.A. was formerly seen by Macintosh and given outcome assessment testing and trigger point injections. Beginning June 30, 2022, DA was purportedly examined and given Trigger Point Injections by Atlantic.

235.    Atlantic like its predecessor Macintosh continues to operate in locations known to be involved in submission of forged referrals and billing submitted using the identities of licensed providers without their knowledge or permission including 71 South Central Ave in Valley Stream, and 3910 Church Ave.

236.    The issues present with the referral or alleged referral of patients by Macintosh providers continues to exist with Atlantic.   For example, Patient DA 043616151-001 was allegedly referred for VNG, Transcranial Doppler and SSR testing by Atlantic provider Wei Hong Xu on 06/22/2022. The billing submitted by Atlantic shows the same pattern with a new patient exam, outcome assessment testing and trigger point injections with ultrasonic guidance. There is no mention of the referral for TCD or other neurological testing in her treatment plan for which Plaintiff was billed.

237.    Even though Dr. Landow stated (during his EUO) that he was "appalled" at the prospect of forged Macintosh Medical referrals, he did not stop the treatment at the locations where

this occurred or the locations where the pattern of referrals for procedures he said would be "very infrequently required" occurred.

238.     Plaintiffs continued to closely monitor Atlantic until finally requesting an Examination Under Oath after it was confirmed that the fraudulent scheme continued.

239.     Atlantic in the guise of Landow was a no show at the Examination Under of Oath of October 4, 2022.   He was a no show at the EUO of October 18, 2022.   Finally, he was a no show at the Examination Under Oath scheduled for October 28, 2022.

240.     Facing the prospect of multiple claim denials Landow's new counsel reached out to USAA and Garrison's counsel to negotiate.

241.     Finally, on May 2, 2023, Landow once again appeared for an Examination Under Oath on behalf of Atlantic.   Landow appeared with new counsel in the form of Neil Torczyner Esq of Harfenist, Kraut & Pearlstein, 3000 Marcus Avenue, Suite 2E1, Lake Success, New York 11042 which is the entity and address listed with the New York State DOS as the service of process address for both Macintosh and Atlantic.

242.     For this second EUO, and as a consequence of his first EUO, Landow was severely cloistered by counsel who voluminously raised improper objections such as objecting to a question as to whether Landow reviewed the May 26, 2023, Response to the Post Examination Under Oath Request for Additional Verification on the grounds of attorney client privilege.

243.     To the simple question: "And why did Macintosh stop seeing patients in June of 2022?" Landow's counsel objected.   The following obviously rehearsed and coached exchange ensued:

> MR. TORCZYNER: Objection to the extent that the witness can answer without relying on the advice of counsel or divulging anything privileged by the attorney/client

privilege. Are you capable of answering that question without providing attorney/client information.

> THE WITNESS: I don't think so, because it was on advise [sic] of counsel.

> MR. TORCZYNER: Okay. Well, that's where we'll stop.

That was smarmy for the obvious reason that the question was not gauged to elicit what advice Mr. Landow's counsel gave him.   It was gauged to ascertain why Macintosh stopped seeing patients.   To wit if Jeff Bezos' counsel told Bezos to close Amazon it is highly doubtful that he would do such without good factual reason beyond counsel's advice.

244.    As it turned out according to Landow every Macintosh location from the immensity of locations became an Atlantic location save one.   The location at 3910 Church Avenue "closed down suddenly and then reopened."   The "unauthenticated" referrals discovered in the prior Examination Under Oath was a contributing factor to Landow's decision to not go back to Church Avenue when it reopened – according to Landow.

245.    As to employees:

MR. GERBINO: Well, were there Macintosh employees that then became employees of Atlantic in June of 2022?

A.  So, were there any? The answer is, yes.

Q. To the best of your knowledge, did Atlantic employ all of the Macintosh employees in June of 2022? Or only a few of them? Or a select few, for lack of a better term?

A. Given all those choices, I would say not all. I haven't done the analysis, so I can't really qualify much more than that.

Q. So, there were some employees that came over and some that did not come over. You don't have an analysis as to who or why?

A. I've never been asked that question, so I haven't done the analysis; that's my best answer, given my recall of something that I haven't studied previously.

Q. Were there any Macintosh employees that you refused to take over at the Atlantic for any given reason that you may have had at that time?

A. I don't recall.

246.     Atlantic is not a Fortune 500 corporation.   Despite the enormous amount of locations where it operates from the whereabouts of the employees are ascertainable through memory especially if one purports to have hired every professional and negotiated their salary (20 of them); to have bi-weekly staff meetings "that includes all clinical personnel" and is "recorded … if some cannot attend;" all staff has Landow's cell number and are "encouraged to call me, text me, reach out to me whenever they need to;" and Landow "hosted a lovely holiday party in New York in December of last year where I had very nice attendance and was able to break bread with my team members."

247.     Despite all the above Landow would have to perform some sort of deep analysis to ascertain which employees were switched over from Macintosh to Atlantic.

248.     The foundation was laid for questions regarding the same type illegitimate referrals that were uncovered in the examination of Landow a year earlier regarding Macintosh.

Q. Are you familiar with the VNG testing?

A. I am, yes.

Q. Do you know if your medical employees, if they refer patients of Atlantic for VNG testing?

A. I would think it would be a fairly uncommon occurrence for Atlantic.

Q. Why would you say uncommon occurrence for Atlantic?

A. Because Atlantic has a scope of practice affirmation that is … So, I was just going to add to that, as such, it defines what is scope of practice, and what is not listed would be considered to be added scope.

Q. What is the scope of practice of Atlantic?

MR. TORCZYNER: I'm going to object to let the witness answer to the best of his ability. If you make a request for production of the scope of practice, we can provide it to you subsequently as well. Just because the document itself is, having seen it is multiple pages long. So, I'll let the witness answer to the best of his ability.

MR. GERBINO: Okay. That's fair enough. But I just want to state, because you did initiate an objection, the doctor has answered a question regarding VNG testing and he indicated it's uncommon based upon the scope of practice. My question really is, to the best of his knowledge, without seeing the document, what is his belief.

MR. TORCZYNER: Right. What I mentioned to you in my objection was, I'll let him answer the question. I offered the document. The witness is certainly capable of when you're asking a question that seeks the contents of a document -- again, I'm allowing him to answer, but I'm suggesting that maybe you make the request for the document, that it can be provided. Go ahead, you can answer, Doc.

[That bit of obstruction and witness coaching was uncalled for]

A. Yeah. So, I didn't really complete my thought earlier. So, I need to continue it. The scope of practice is specific for specialty. So, this scope of practice I'm referring to would be one that's specific for primary care and pain management. It would be different, say, for orthopedics and any other specialty   that Atlantic Medical is currently involved with or might be involved with in the future.

Q. So, just so I'm clear on that, Doc, are you saying that the scope of practice for Atlantic is pain management as well as primary care?

A. That is correct.

Q. So, in terms of that issue, though, with respect to referrals for VNG testing, are you aware of any referrals for VNG testing that would come from your licensed practitioners?

A. And we're speaking just for Atlantic?

69

Q. Correct.

A. So, I'm not aware of it.

Q. What about transcranial Doppler testing? Do you know if your licensed practitioners refer patients of Atlantic for what we call TCD or transcranial Doppler?

A. I would respond the same way as I did for VNG.

Q. And what about also for SSR, which is sympathetic skin response testing? Have you ever had any knowledge of whether or not your licensed practitioners are referring Atlantic patients for SSR testing?

A. I would again respond the same way as VNG.

Q. Are you familiar with those types of tests? I know you're familiar with VNG, but are you familiar with SSR?

A. I don't profess to know much about it.

Q. What about yourself, would you ever, as a medical practitioner, do you see any medical need for sympathetic skin response testing?

A. Again, I don't think I know enough about it to discard it entirely. I could tell you that from what I know of it, which is somewhat limited, I'm not aware of it as being a mainstream diagnostic test.

249.    Landow was given fair warning:

And I guess my question to you is: In terms of some of the patient files, and I'll show you examples, that I've come across again, I've noted some referrals from the nurse practitioners; the VNG, TCD, SSR relating to Atlantic patients? My question is: Have you become aware the fact that there are these types of referrals emanating out of the clinics where Atlantic is doing business for transcranial Doppler, SSR, and VNG?

MR. TORCZYNER: Objection. You can answer that question; if you can.

A. Yeah. It's a similar question to what I was asked earlier, and I'll respond the same way. I'm not aware of it. I'm not saying it's impossible. I'd be very curious to see specific

examples, especially in light of the conversations I've had with my clinical staff and the scope of practice affirmation that they have signed.

250.    Then Landow was shown Exhibit B:

Q. I'm curious to see if you recognize the referral script. So, Doctor, this is a bill that we have marked as Exhibit B for identification from Opaque, New York, Inc., and it relates to a patient seen by Atlantic. We can scroll through the whole document; it's 19 pages. The last document, it's the one next to last, I should say. The next to last page is really where I'm focused, but I want you to see the whole thing and go through it.

A. Okay. Yeah. I'm already intrigued by the provider's name.

Q. Yeah, me too.

A. I mean, for a couple of reasons. One, it's self-evident; the other one is the suffix, INC is the c-corp, not a professional company.

***

Q. This is the referral script. I do have questions about Idy Lang, and initial eval and follow-up eval, but it's all related to this. Do you recognize that referral script as something that would emanate from your practice?

A. No. It's certainly not. It's not our form.

Q. Would you be able to tell if Idy Lang's signature is correct or authentic, I should say?

A. I'm not. I'm not able to confirm that.

251.    Landow became even more cloistered by a wall of counsel's objections:

Q. So, the last time we met back in April of 2022, we talked about some referrals for shockwave, transcranial Doppler, and VNG back then. And my question to you is: Since that time to now, have you done any type of investigative-type work on your own to determine whether or not those referrals were authentic or not authentic?

MR. TORCZYNER: Objection. Ask another question, please.

MR. GERBINO: What's that?

MR. TORCZYNER: I'm objecting and I'm asking you to ask another question. This is for verification of claims by Atlantic. I'm not going into what was done for Macintosh.

And yet another lengthy colloquy between counsel ensued for pages and the question was never answered. We do learn that thirty-nine (39) USAA insureds that were patients of Macintosh on one day became patients of Atlantic the next day.

252.     The questioning drifted to lease agreements between Atlantic and the clinics where Macintosh formerly operated were once located with Landow reading off a spread sheet.   He has no idea how they came to be at clinics other than "we enjoy an excellent reputation."    We once again learn that the aforementioned layperson Kanny – the Director of Operations – goes out and scouts these locations.   Or it could be Kamla.   But Landow has not been to the locations although he states, "I have another medical director who visits every office every month who is probably better suited to tell you what color the wallpaper is, what floor it's on, and so forth."

253.     We also learn that although highly touted by Landow in the first Examination Atlantic does not bill for Outcome Assessment testing anymore although Landow will not tell us why:

Q. The next few pages talk about an outcome assessment report. Are you familiar with that?

A. I am.

Q. And is that document that's prepared by the patient answering certain questions on the document itself?

A. In part, yes.

Q. And is this something that Atlantic currently bills for? The outcome assessment outcome test or report?

A. We do not.

Q. And is there any reason why Atlantic does not bill for that report or assessment?

[A fair and simple question]

MR. TORCZYNER: Objection to the extent that if it could be answered without advice of counsel, the witness can answer. If it relies on the advice of counsel, I cannot allow him to answer the question.

A. On the advice of counsel.

MR. TORCZYNER: There you go. He can't answer why he does not bill for this.

Q. Okay. This type of a test is previously billed by Macintosh and is no longer billed by Atlantic. And is the reason why it's based upon the advice of counsel? Or was there any other reason why you chose not to bill this any further?

MR. TORCZYNER: Even if it has any function on the advice of counsel, I can't allow him to answer the question. He's provided you with an answer. Please ask another question.

MR. GERBINO: Okay. I did ask another question, and you're saying that he's not going to answer that.

MR. TORCZYNER: Right. To the extent any part of the answer relies on the advice of counsel, I cannot allow him to answer the question. Please ask him another question.

MR. GERBINO: But my question was –

MR. TORCZYNER: I know. You wanted to know if there was anything else; I still cannot allow him to answer.

MR. GERBINO: Okay. That's fine. I don't agree with your objection, but we'll move on to something else. Can you go to the next few pages?

The answer is obvious. The test is brazen fraud and Landow's handlers want to put on a façade of legitimacy.

254.    But the façade crumbles first with the issue of durable medical equipment ("DME") and blanket referrals for anything and everything that the clinic managers want to charge a prohibited referral fee for:

Q. My question is: Do you know what that means to have DME 1st and 2nd set as scheduled? What is the terminology "1st and 2nd set" means? And then what does the terminology, "as scheduled" mean?

A. I'm not sure if that's -- that may be unique language that is being used by this particular provider [Landow's alleged employee] anticipating that there's going to be -- again, I'm going to now attempt to explain what I think is in the provider's head. It sounds like it's anticipatory. There's an initial set and then the presumption is that if there were a need to do something more robust, there would be a second set. But then, again, that's my assumption.

Q. The line under the "DME's 1st and 2nd set as scheduled it refers to:" "Please provide S.A.M. (Sustained Acoustics Medicine) Machine: Water Circ Vacu-thermal therapy and Pump." Would these be the devices that this provider is ordering as DME for this patient?

A. Yes.

MR. GERBINO: Now, you can scroll fully to page 7.

Q. This would be a continuation of the DME being requested. "Cervical Collar Cervical Pillow." I don't know what a "Game Ready System" is. Do you, Doctor? "Please provide Game Ready Systems.?"

A. I'm familiar with it as a category. So, I'm familiar with it in the context of professional athletes and what that means.

Q. What does it mean in this context? If you know?

A. It's usually, it's used to enhance circulation, so there's an element of compression to help.

Q. Is that a device?

A. I'm sorry?

Q. Is it a device of some kind? Is a Game Ready System a specific circulation device –

A. Yeah. Again –

Q. -- or does it relate to one of earlier items?

A. I think that if I haven't made it clear, I'm referencing my understanding of it in the context of the facility that it treats a lot of professional athletes. So, I'm not sure about this. My guess is next time we have an EUO, they'll be more to talk about with respect to DME.

Not one professional athlete attends the facility in question.

255.    The report recommends still more DME:

Q. Okay. The other devices mentioned there: "Lumbar Sacral Support, Lumbar Cushion, Bed Board, Egg Crate Mattress/Bed Board Orthopedic Car Seat Support, Lumbar Cushion Wide, EMS unit 4 leads, TENS/EMS placement belt, Infrared Heating Lamp, Massager." That will be all devices that this particular provider is ordering following this initial evaluation?

A. It would seem so.

Q. And then it goes down to the "DME SET 2 - Ordered." Is that terminology, "Ordered" does that mean they've already ordered a second set of DME   devices consisting of the EMG unit, TENS belt, infrared heating lamp, massager? I don't know why it would indicate a second set when this seems to be part of the top line first set?

A. Yeah. I'm afraid I cannot shed much light on that.

Q. What about this list of DME devices? "Vascutherm, SAM, MSK, EMG, Laser - ordered?"

MR. TORCZYNER: What's the question?

Q. My question is: What does that refer to? Is that a separate set of DMEs? Or was that part of what was previously mentioned in the report, if you know?

A. Could you scroll up? I just want to get a little more context.

(Whereupon, an off-the-record discussion was held.)

Q. It seems to start here, where the practitioner's talking about, "Please provide S.A.M. (Sustained Acoustics  Medicine) Machine: Water Circ Vacu-therma therapy and Pump." That's where I see the DME at least starting, but you can look at it.

\*\*\*

A. So, again, I'm assuming that these are things that could have been ordered …

\*\*\*

Q. But in terms of the indications in the report, Doctor, relating to 1st and 2nd set of ordered DME devices; to the best of your knowledge, that is not a protocol that you have put in place that DME needs to be separated into 1st and 2nd sets of ordered equipment?

A. No. No. I'm not familiar with that, that organization of DME.

Landow would later testify that DME "is supposed to be custom tailored to the specific needs at hand, as opposed to something different than that."

256.    Landow was asked point blank:

Q. That type of order and those types of tests: the TCD, the VNG, the SSR -- and emanating from entities such as Opaque, Inc., and there are others like that. Do you have any knowledge, whatsoever, where's that coming from? Or who is involved at your clinic as to referring for those types of tests outside of your knowledge?

A. No. I only find out about these things when they're brought to my attention. Because, remember, this is if this is being done by a third party without authority, who's completely outside of our scope, control, and awareness, then I would only find out when someone like you or the insurance company brings it to my attention. And similar to what I said a year ago, you used the word, "cooperation." I said a year ago, I would love to cooperate. I say the same thing to you today. What I said then was, please give me specific information and ask us to validate things as being true or not true, and then how can we help you. Because I'm **outraged** if someone is doing something that is improper. **Outraged**.

\*\*\*

When I say I'm **outraged**, I mean this is the kind of thing that should rise to a level of figuring out who these people are that are doing bad things, and let the folks who deal with them, deal with them.

*** 

Yes. Yes. And again, I'm hoping that counsel -- and counsel on both sides can work together –

MR. TORCZYNER: Your purpose here is to answer the questions.

THE WITNESS: I'm sorry. I'm sorry. I get a little **outraged**, and, you know.

257.    As established *supra* neither Landow nor his counsel cooperate.

258.    Landow testified as to more of the particulars of the financing of receivables with DLF wherein Atlantic receives 37.5 percent up front for each claim.   DLF would take the other 62.5% if they could collect on such billing.

259.    Atlantic engages in no marketing, promotion or advertising beyond business cards. It does not even have a website.

260.    Macintosh is totally gone – it does not have a single employee "for now."

## C. THE USE OF SHELL ENTITIES

261.    Although Landow will feign outrage over highly irregular fraudulent practices, Landow and his handlers will go through unscrupulous pains to effectuate the multi-faceted fraudulent machinations of the ever-evolving scheme.

262.    In *Government Employees Insurance Company, et al. v. Landow, M.D., et al.* 21-cv-01440 (NGG)(RER) GEICO served three subpoenas on JP Morgan Chase seeking bank records of nonparty entities GTY Corp. ("GTY"), Carbon Capital Management Corp. ("Carbon"), and Phenixx Management Corp. ("Phenixx") (collectively, "Nonparty Entities")

263.    GEICO's Complaint sought to recover $3.9 million that Landow's prior scheme had stolen from it by submitting over $24 million in fraudulent claims for excessive, medically unnecessary healthcare services. It was alleged that pursuant to this scheme, Landow caused his professional corporations to interchangeably operate at dozens of no-fault Clinics illegally owned/controlled by laypersons who, in exchange for illegal referral payments, provided the Defendants with access to the clinics' patients such that the Defendants could subject them to the unnecessary healthcare services and submit fraudulent bills to GEICO.

264.    The above are just allegations. What we learned afterward is fact. Landow and his handlers sought to quash the above subpoenas arguing that GEICO was targeting Landow's family as part of a "crusade."   Landow appeared to be "outraged."

265.    Landow's never explained or even acknowledged that the Nonparty Entities received *over $9.1 million* from his professional corporations without any mention of them in interrogatory responses or any production of documents to indicate these were legitimate business transactions.

266.    Further, in support of the motion to quash, Landow vaguely claimed that his late mother "owned an interest" in the Nonparty Entities and misleadingly suggested he only began to act on behalf of the entities after letters of administration for his mother's estate were issued in March 2020.

267.    However, as referenced in a published Decision and Order in New York State Supreme Court, where Landow was held in contempt for willfully disobeying a TRO against him and some of his professional corporations, Chase Bank issued a letter on July 2, 2019 confirming Landow is a "*signor on all held accounts*," including the same accounts referenced in the subpoenas – Phenixx Account No. 0363, GTY Account No. 3796, and Carbon Account No. 7982.

*See Qwil PBC & Enter, Inc. v. Landow*, Index. No. 653605/2019 at p. 5 (Sup. Ct., New York Co., March 30, 2020).

268.    The court in <u>*Qwil PBC & Enter, Inc*</u>. not only noted that Landow was a signatory on all Chase accounts, but also stated that (i) Landow's professional corporations had granted a funding/servicing company (Enter, Inc.) access to the Chase accounts and (ii) "Landow's contention that the Carbon Account…is held by his mother and daughters who 'own and control Carbon' is also just false." (P.4)

269.    The court further stated, "it is simply not true that Carbon is wholly unrelated to Dr. Landow *and Dr. Landow's statement to the contrary is a willful and contumacious attempt to commit fraud on this court*." (Pgs. 14-15) (Emphasis added) *See also* <u>Carbon Capital Management LLC v. Am. Express Co.</u>, 88 AD3d 933, 940 (2d Dept 2011) ("[Carbon] is owned and managed by Landow").

270.    Further it was revealed that Landow used transfers purportedly to family, Florida LLCs, and other entities to prevent identification of the specific dollars used to fuel illegal payments for patient referrals. The scheme spanned 40 bank accounts, thousands of online transactions, and tens of millions of dollars moved without any legitimate business explanation. The financial entanglements, coupled with Landow's financial misdirection, is consistent with illegal "pay to play" relationships – including gaining access to numerous no-fault clinics by paying sham "rent" (sometimes pursuant to unsigned or forged leases) to "landlords" who testified they never heard of Landow or his professional corporations; causing the Landow professional corporations to interchangeably operate – some concurrently and/or successively – at dozens of no-fault clinics where the PCs Defendants provided no legitimate, medically necessary treatment.

271.     There was also the funneling of monies without any written agreement to purported "funding companies" whose owner acknowledged at a deposition that the owner worked at one of the no-fault clinics and funded specific healthcare services at specific clinics; operating at multiple no-fault clinics where the U.S. Government developed evidence through wiretaps that the clinics were operated by laypersons "paying kickbacks for referrals" of accident victims (*see USA v. Rose*, 19- cr-00580-LTS (S.D.N.Y. 2019)); and causing checks issued to at least one Landow professional corporation to be exchanged for cash by someone previously indicted for recruiting individuals to act as phony patients.

272.     The Nonparty Entities were not Landow's only attempt to use his family to conceal his fraudulent activity and suspect financial arrangements. Landow was outraged that Landow's domestic partner, Joni Wilkins, was forced to sit for a deposition.   Yet Wilkins and her company received $2.8 million in transfers. Wilkins was unable to produce any documents whatsoever with respect to approximately $2.4 of that total, let alone any documents or evidence to suggest any of the monies transferred had any legitimate business purpose. Meanwhile Wilkins who resides in Florida was a purported W-2 Employee of Macintosh that solely operated in New York.   We do not know her alleged earnings because said earnings were "whited out" on the W-2 Wage and Tax Statement provided by Landow prior to the Macintosh Examination Under Oath.

273.     GEICO also subpoenaed Stadium Capital Four LLC – a Florida entity whose sole members are Landow's daughters, and which received $10.9 million from Macintosh Medical – again without any mention of this entity in interrogatory responses, without any documentation produced, and without any indication that these were legitimate business transactions.

274. The suspect transactions are magnified by the fact that the Landow professional corporations failed to produce any corporate income tax returns for many years. For Macintosh Landow produced zero corporate income tax returns.

275. Perhaps counsel's advice to close Macintosh had more to do with just insurance fraud.

### PREDETERMINED FRAUDULENT TREATMENT PROTOCOL

276. As part of the fraudulent scheme, Landow, the Provider Defendants, the Doe Defendants, the Clinic Defendants and the Referral Entities (collectively "Defendants") implemented fraudulent billing and treatment protocols in which they caused each Insured who treated with the Provider Defendants and the Referral Entities to be subjected to a host of medically unnecessary services rendered and billed to Plaintiffs in order to create fraudulent profits.

277. The Provider and Referral Entity Defendants purported to provide the predetermined fraudulent treatment protocols to Insureds without regard for the Insureds' individual symptoms or presentation, or the actual medical needs of the Insureds.

**A. The Fake Initial Examinations**

278. Pursuant to the Defendants' pre-determined treatment and billing protocols as well as the corrupt financial arrangements, the Provider Defendants purport to perform initial medical examinations on the overwhelming majority of the Insureds they treated.

279. The initial examinations essentially were performed to provide Insureds with pre-determined "diagnoses" to allow the Defendants to bill for the laundry list of other Fraudulent Services and as a catalyst for the Referral Entities' billing.

280. The Defendants created a boilerplate, pre-determined "diagnosis" for the Insureds, wherein the Defendants steered the Insureds into receiving a pre-determined pattern of treatment,

referrals, and recommendations to return for services at the Clinics from which the Provider Defendants leased office space.

281.     Defendants billed the initial examinations to Plaintiffs under current procedural terminology ("CPT") codes 99204 typically resulting in a charge of $203.76.

282.     The charges for the initial examinations misrepresented the severity of the Insureds' presenting problems and the nature and extent of the initial examinations.

283.     According to the New York Workers' Compensation Medical Fee Schedule and New Jersey medical fee schedule (collectively, the "Fee Schedule"), which are applicable to claims for No-Fault Benefits, the use of CPT code 99204 typically requires that the physician spend at least 45 minutes of face-to-face time with the Insured or the Insured's family.

284.     Though the Provider Defendants routinely billed for the initial examinations under CPT code 99204, no medical practitioner employed by the Defendants ever spent 45 minutes of face-to-face time with the Insureds or their families. Rather the initial examinations rarely lasted more than 15 minutes, to the extent that they were conducted at all.

285.     The Provider Defendants used boilerplate forms in documenting the initial examinations, setting forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

286.     All that was required to complete the boilerplate forms was a cursory patient interview and a cursory physical examination, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and basic neurological testing.

287.     These interviews and examinations did not require any medical professional employed by the Provider Defendants to spend 45 minutes of face-to-face time with the Insureds.

288.    According to the Fee Schedule, the use of CPT code 99204 typically requires that the Insured presented with problems of moderate or moderate-to-high severity.

289.    Though the Provider Defendants routinely billed for the initial examinations under CPT code 99204, the Insureds did not present with problems of moderate or moderate-to-high severity as the result of any auto accident. Rather, to the extent that the Insureds had any health problems as the result of auto accidents, the problems almost always were of low severity.

290.    Even though the Insureds almost never presented with problems of moderate or moderate-to-high severity as the result of an auto accident, in the unlikely event that an Insured was to present with problems of moderate or moderate-to-high severity, the deficient initial examinations were incapable of assessing and/or diagnosing problems of such severity.

291.    According to the Fee Schedule, when the Provider Defendants submitted charges for initial examinations under CPT code 99204, they represented that they: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "moderate complexity."

**1.    Falsehoods Regarding "Comprehensive" and "Detailed" Patient Histories**

292.    Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, a patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

293.    Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

294. The CPT Assistant recognizes the following fourteen (14) organ systems with respect to a review of systems: (i) constitutional symptoms (i.e. fever, weight loss); (ii) eyes; (iii) ears, nose, mouth, throat; (iv) cardiovascular; (v) respiratory; (vi) gastrointestinal; (vii) genitourinary; (viii) musculoskeletal; (ix) integumentary (skin and/or breast); (x) neurological; (xi) psychiatric; (xii) endocrine; (xiii) hematologic/lymphatic; and (xiv) allergic/immunologic.

295. When the Provider Defendants billed for the initial examinations under CPT code 99204, they falsely represented that they took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations.

296. No Provider Defendant ever took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations, because they did not document a review of the systems directly related to the history of the patients' present illnesses or a review of 10 organ systems unrelated to the history of the patients' present illnesses.

297. Rather, after purporting to provide the initial examinations, the Provider Defendants simply prepared reports containing bogus patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

298. These sham patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of Fraudulent Services that Defendants purported to provide and then billed to Plaintiffs and other insurers.

299. Pursuant to the CPT Assistant, a "detailed" patient history requires – among other things – that the examining physician take a history of systems related to the patient's presenting problems, as well as a review of a limited number of additional systems.

300. Pursuant to the Fee Schedule, a "detailed" patient history also requires that the healthcare provider take a past medical history, family, and social history from the patient to the

extent that the patient's past medical history, family, and social history is related to the patient's presenting problems.

301.    No Provider Defendant ever took a "detailed" patient history from Insureds during the initial examinations, as they did not review systems related to the patients' presenting problems, did not conduct any review of a limited number of additional systems, and did not take a past medical history, family, and social history from the patients to the extent that the patients' past medical history, family, and social history were related to the patients' presenting problems.

302.    Rather, after purporting to provide the initial examinations, the Provider Defendants simply prepared reports containing false patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

303.    These fake patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the Fraudulent Services that the Provider Defendants purported to provide and then billed to Plaintiffs and other insurers.

### 2.    Falsity Regarding "Comprehensive" and "Detailed" Physical Examinations

304.    Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

305.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

306.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the

physician has documented findings with respect to at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

307.    In addition the general appearance of the patient – *i.e.*, development, nutrition, body habits, deformities, and attention to grooming; examination of the peripheral vascular system by observation (*i.e.*, swelling, varicosities) and palpation (*i.e.,* pulses, temperature, edema, tenderness); palpation of lymph nodes in neck, axillae, groin, and/or other location; examination of gait and station; examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity inspection and palpation of skin and subcutaneous tissue (*i.e.,* scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (i) head and neck; (ii) trunk; (iii) right upper extremity; (iv) left upper extremity; (v) right lower extremity; (vi) left lower extremity; (vii) coordination, deep tendon reflexes, and sensation; and (viii) mental status, including orientation to time, place and person, as well as mood and affect.

308.    When the Provider Defendants billed for the initial examinations under CPT code 99204, they falsely represented that they performed a "comprehensive" patient examination on the Insureds they purported to treat during the initial examinations.

309.    No Provider Defendant ever conducted a general examination of multiple patient organ systems or conducted a complete examination of a single patient organ system, nor did they document findings with respect to at least eight organ systems.

310.    Furthermore, although the Provider Defendants often claimed to provide a more in-depth examination of the Insureds' musculoskeletal systems during their supposed initial

examinations, the musculoskeletal examinations did not qualify as "complete", because they failed to document:

    (i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

    (ii)    the general appearance of the patient – i.e., development, nutrition, body habits, deformities, and attention to grooming;

    (iii)   examination of the peripheral vascular system by observation (*i.e.*, swelling, varicosities) and palpation (i.e., pulses, temperature, edema, tenderness);

    (iv)   palpation of lymph nodes in neck, axillae, groin, and/or other location;

    (v)    examination of gait and station;

    (vi)   examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

    (vii)   inspection and palpation of skin and subcutaneous tissue (*i.e.,* scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

    (viii)  coordination, deep tendon reflexes, and sensation; and

    (ix)   mental status, including orientation to time, place and person, as well as mood and affect.

311.    Pursuant to the Fee Schedule, a "detailed" physical examination requires – among other things – that the healthcare services provider conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

312.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a detailed examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

    (i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

    (ii)    the general appearance of the patient – *i.e.,* development, nutrition, body habits, deformities, and attention to grooming;

      (iii)     examination of the peripheral vascular system by observation (*i.e.,* swelling, varicosities) and palpation (*i.e.,* pulses, temperature, edema, tenderness);

      (iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

      (v)     brief assessment of mental status;

      (vi)     examination of gait and station;

      (vii)     inspection and palpation of skin and subcutaneous tissue (*i.e.,* scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

      (viii)     coordination;

      (ix)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

      (x)     examination of sensation.

313.    The Provider Defendants' motor examinations were clinically useless, and they did not routinely perform any sensory examinations regardless of patient's complaints or symptoms.

    **3.**    **Misrepresentations Regarding the Extent of Medical Decision-Making**

314.    When the Provider Defendants submitted charges for initial examinations under CPT code 99204, they represented that they engaged in medical decision-making of "moderate complexity."

315.    Pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

316.    Though the Provider Defendants routinely falsely represented that their initial examinations involved medical decision-making of "moderate complexity" in actuality the initial examinations did not involve any medical decision-making at all, and, in the unlikely event that

an Insured did present with such injuries or symptoms, the deficient initial examinations were incapable of assessing and/or diagnosing them as such.

317.    First, the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information. When the Insureds presented to the Provider Defendants for "treatment", they did not arrive with any medical records. Furthermore, prior to the initial examinations, the Provider Defendants did not request any medical records from any other providers, nor conducted any diagnostic tests. As noted above, Landow did not consider the patients to be the Defendants' patients, but rather the patients of the respective Clinics as they did not arrive for treatment based on any marketing, advertising or outreached performed by Landow or any of the Defendants.

318.    Second, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints.

319.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Provider Defendants if properly administered, to the extent that the Provider Defendants provided any such diagnostic procedures or treatment options in the first instance. In the unlikely event that such risks did exist, the deficient initial examinations were incapable of identifying such risks.

320.    Third, the Provider Defendants did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

321.    Rather, to the extent that the initial examinations were conducted in the first instance, the Provider Defendants provided a nearly identical, pre-determined "diagnosis" for the Insureds, and prescribed a similar course of treatment for each Insured.

322.    The purported results of the initial examinations did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the Fraudulent Services that Provider Defendants purported to perform as well as the other services provided at the Clinics by the Clinic Defendants and by the Referral Entities and then billed to Plaintiffs.

323.    For example, the initial examination findings often did not support the supposed subjective complaints and rarely, if ever was there any explanation as to why Insured's treatment plans were virtually identical, consisting of a routine set of services that were referred, recommended and prescribed despite lack of clinical documentation in the initial examination reports. Typically, such a plan included (i) MRIs; (ii) trigger point and other injections; (iii) pharmaceuticals; and (iv) DME; (v) extensive physical therapy; (vi) chiropractic treatments (vii) Shockwave Therapy; (viii) a battery of experimental diagnostic sets discussed herein; and (ix) acupuncture, etc., are all ordered anyway despite a complete lack of clinical justification. Additionally, there was rarely, if ever, evidence of documentation showing any coordination of care with chiropractic or physical therapy providers at the Clinics.

324.    The Provider Defendants prescribe various medically unnecessary pharmaceuticals and DME despite there being no legitimate symptoms for such prescriptions. These Provider Defendants wrote these prescriptions pursuant to the improper financial arrangements with the clinic owners/controllers and others at the various Clinics.

325.    The Provider Defendants rendered services from certain clinics such as 3910 Church Avenue, Brooklyn and 492 Lefferts Avenue, Brooklyn and a host of others where Plaintiffs obtained information that clinic laypersons were forging referrals.

326.     The Provider Defendants prescribed DME, pharmaceuticals, and other items, such as MRIs to falsely document that Insureds appear severely injured and to legitimize the other Fraudulent Services the Defendants performed.

**B. The Fraudulent Follow-Up Examinations**

327.     In addition to the fraudulent initial examinations, Defendants Macintosh and Atlantic typically purported to subject Insureds to one or more fraudulent follow-up examinations during their fraudulent treatment protocol.

328.     The Provider Defendants billed the follow-up examinations to Plaintiffs under CPT code 99213, resulting in a charge of $87.80 or CPT code 99214, resulting in a charge of $127.41.

329.     The charges for the follow-up examinations were fraudulent in that the follow-up examinations were medically unnecessary and were performed pursuant to the illegal referral payments and financial arrangements, referral schemes and fraudulent treatment protocol.

330.     The charges for the follow-up examinations also were fraudulent in that they misrepresented the extent of the follow-up examinations.

331.     The use of CPT code 99213 typically requires that the physician spend 15 minutes of face-to-face time with the Insured or the Insured's family. Likewise, the use of CPT code 99214 typically requires that the physician spend 25 minutes of face-to-face time with the Insured or the Insured's family.

332.     Though the Provider Defendants routinely billed for the follow-up examinations under CPT codes 99213 or 99214, no physician associated with the Follow-Up Examination Defendants ever spent 15 minutes of face-to-face time with the Insureds or their families during the follow-up examinations, much less 25 minutes. Rather, the follow-up examinations rarely lasted no more than 10 minutes, to the extent that they were conducted at all.

333.   The Follow-Up Examination Defendants issued bogus, boilerplate "follow-up examination" reports to further support the Fraudulent Services that Defendants purported to perform and then billed to USAA and other insurers, including interventional pain management injections and surgical procedures. The bogus, boilerplate results were also used to support the other medical services being performed at the Clinics.

**C. The Fraudulent "Outcome Assessment Testing"**

334.   The Provider Defendants caused bills to be submitted to Plaintiffs representing that the Defendants frequently subjected Insureds to medically useless "outcome assessment tests" on or within a few days of the same date they purported to subject the Insureds to examinations.

335.   The Defendants billed the "outcome assessment tests" to Plaintiffs using CPT code 99358, generally resulting in a charge of $280.12 for each round of "testing."   They even purport to have provided this testing on New Year's Day of 2022.

336.   Like the Provider Defendants' charges for the other Fraudulent Services, the charges for the "outcome assessment tests" were fraudulent in that the tests were medically unnecessary and were performed, to the extent they were performed at all, pursuant to the illegal payment and referral schemes and fraudulent treatment protocol.

337.   The "outcome assessment tests" purportedly provided to Insureds were pre-printed, multiple-choice questionnaires on which the Insureds were invited to report the symptoms they were experiencing, and the impact of those symptoms on their daily lives.

338.   Since a patient history and physical examination must be conducted as an element of a soft-tissue trauma patient's initial and follow-up examinations, and since the "outcome assessment tests" purportedly provided were nothing more than a questionnaire regarding the

Insureds' history and physical condition, the Fee Schedule provides that the "outcome assessment tests" should have been reimbursed as an element of the initial and follow-up examinations.

339.     Healthcare providers cannot bill for an examination and then bill separately for contemporaneously provided "outcome assessment testing."

340.     In the event the Outcome Assessment Testing Defendants did perform the "outcome assessment tests" for which Plaintiffs were billed, the information gained through the use of the tests would not have been significantly different from the information obtained during virtually every Insured's examination. In fact, the Defendants, in billing for fraudulent initial and follow-up examinations, represented they took at least a "detailed" if not "comprehensive" patient history and performed at least a "detailed" if not "comprehensive" physical examination.

341.     The "outcome assessment tests" represented purposeful duplication of the patient histories and examinations purportedly conducted during the Insureds' initial examinations and follow-up examinations.

342.     The Provider Defendants' use of CPT code 99358 to bill for the "outcome assessment tests" also constituted a deliberate misrepresentation of the extent of the service that was provided. Pursuant to the Fee Schedule, the use of CPT code 99358 represents – among other things – that the physician actually spent at least one hour performing some prolonged service, such as a review of extensive records and tests, or communication with the Insured and the Insured's family.

343.     Though the Provider Defendants routinely submitted billing under CPT code 99358 for "outcome assessment tests," no physician associated with the Provider Defendants spent an hour reviewing or administering the tests or communicating with the Insureds or their families.

344.    Indeed, the "outcome assessment tests" did not require any physician involvement at all, inasmuch as the "tests" simply were questionnaires that were completed by the Insureds.

345.    Nevertheless, the Provider Defendants submitted billing to Plaintiffs for billing under CPT code 99358.

346.    Macintosh billed for outcome assessment testing on approximately 99% of Plaintiffs' insureds.

347.    The results of the outcome assessment tests like the other Fraudulent Services, were not incorporated into the Insureds' respective treatment plans.

**D.    The Fraudulent Charges for Medically Unnecessary Trigger Point Injections**

348.    Based upon the phony, boilerplate "diagnoses" and "treatment plans" the Defendants documented, during their fraudulent initial examinations and follow-up examinations, Macintosh and Atlantic (once again the Provider Defendants) purported to subject many Insureds to a series of medically unnecessary pain management injections, including, but not limited to trigger point injections with ultrasound.

349.    The trigger point injections were billed to Plaintiffs through the Provider Defendants using CPT code 20553, representing trigger point injections in 3 or more muscles.

350.    Like the charges for the other Fraudulent Services, the charges for the trigger point injections were medically unnecessary and were provided – to the extent that they were provided at all – pursuant to the phony, boilerplate "diagnoses" and "treatment plans" that the Defendants provided during their fraudulent initial consultations and follow-up examinations.

351.    In fact, in almost every instance, Insureds were subject to trigger point injections on the same day they were subject to a phony initial or follow-up examination.

352.     Moreover, in the claims for trigger point injections the charges for the injections were fraudulent in that they misrepresented the Provider Defendants' eligibility to collect No-Fault Benefits in the first instance because – as a result of the illegal referral payments, improper financial arrangements and referral scheme described herein – they were not in compliance with relevant laws and regulations governing healthcare practice in New York.

**1.  Standards for the Legitimate Use of Trigger Point Injections**

353.     Trigger points are irritable, painful, taut muscle bands or palpable knots in a muscle that can cause localized pain or referred pain that is felt in a part of the body other than that in which the applicable muscle is located. Trigger points can be caused by a variety of factors, including direct muscle injuries sustained in automobile accidents.

354.     Trigger point injections typically involve injections of local anesthetic medication into a trigger point. Trigger point injections can relax the area of intense muscle spasm, improve blood flow to the affected area, and thereby permit the washout of irritating metabolites.

355.     In a legitimate clinical setting, trigger point treatment should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic.

356.     In a legitimate clinical setting, trigger point injections should not be administered until a patient has pain symptoms that have persisted for more than three months and has failed or been intolerant of conservative therapies for at least one month.

357.     Furthermore, in a legitimate clinical setting, trigger point injections should not be administered more than once every two months, or more than six times in any given year.

358.     This is because: (i) properly administered trigger point injections should provide pain relief lasting for at least two months; (ii) a proper interval between trigger point injections is

necessary to determine whether or not the initial trigger point injections were effective; and (iii) if a patient's pain is not relieved through the injections, the pain may be caused by something more serious than a soft tissue injury caused by an automobile accident, and the perpetuating factors of the pain must be identified and managed.

## 2. The Medically Unnecessary Trigger Point Injections

359.    In the claims for trigger point injections the Provider Defendants routinely purported to administer trigger point injections to the Insureds before the Insureds had pain symptoms that persisted for more than three months, and/or before the Insureds had failed or been intolerant of more conservative therapies for at least one month.

360.    Landow is not a pain management specialist or qualified to supervise such services.

361.    Further the Provider Defendant trigger point injections are routinely performed by non-doctors. Despite physician assistants technically being able to perform such services, physician assistants must be supervised by physicians when performing services.

362.    The non-doctors purportedly employed by the Provider Defendants were not adequately supervised during the performance of pain management injections by Landow or any other medical doctor employed by the Provider Defendants.

363.    The Provider Defendants routinely purported to provide trigger point injections within less than three months – and in some cases, within a few weeks – of the auto accidents, before the Insureds could possibly have failed any legitimate course of conservative treatment.

364.    Even when performed correctly, the injections that the Provider Defendants purported to provide can cause significant adverse events including infection, nerve injury, hypotension, anesthetic toxicity, or even death. To the extent that the Provider Defendants

administered injections to Insureds with the frequency set forth in their billing, they increased these risks exponentially.

365.    To further increase the fraudulent billing that they submitted for each round of medically unnecessary trigger point injections, the Provider Defendants routinely submitted a separate charge under CPT code 76942 for "ultrasound guidance" of the trigger point injections, charging $289.20 per "unit" of guidance and routinely billing four units at a time for a total of $1,156.80 for a wholly illusory service.

366.    The charges for "ultrasound guidance" of the injections were fraudulent inasmuch as, like the underlying trigger point injection itself, the ultrasound guidance was not medically necessary and was performed – to the extent that it was performed at all – pursuant to pre-determined fraudulent protocols and illegal referral payments and financial arrangements, designed to maximize the Defendants' billing rather than to treat the Insureds.

367.    Ultrasound guidance is not required to properly administer a trigger point injection. Moreover, (i) the Provider Defendants virtually never appropriately documented the use, need, or placement of the ultrasound guidance, (ii) nor were there any images included in the Provider Defendants' records, or any notations that images were placed into the Insureds' charts, calling into question whether ultrasound guidance was even performed in the first instance.

**E. The Fraudulent Steroid Pain Management Injections**

368.    As part of the fraudulent scheme, in addition to the trigger point injections identified above, the Provider Defendants also fooled and otherwise pressured Insureds to receive multiple injections of the steroid "Dexamethasone Acetate" under CPT code J1094, resulting in charges that varied from $85.00 four units to $397.50 for six units, virtually always on the same day as Insureds received trigger point injections and an initial or follow-up examination.

369.     To the extent that the Insureds in the claims experienced any injuries at all in their minor accidents, the injuries were minor soft tissue injuries.

370.     For the claims for steroid injections the Provider Defendants: (i) routinely administered steroid pain management injections to Insureds who did not have any symptoms that legitimately would warrant the injections; and (ii) routinely purported to administer multiple steroid injections, and multiple varieties of pain management injections, to Insureds within a span of weeks, despite the fact that such an injection regimen not only was medically unnecessary, but also placed the Insureds at risk.

371.     Dexamethasone injection is generally used to treat severe allergic reactions. It is also used: in the management of certain types of edemas (fluid retention and swelling; excess fluid held in body tissues,); gastrointestinal disease; and certain types of arthritis. Dexamethasone injection can also treat certain conditions that affect the blood, skin, eyes, thyroid, kidneys, lungs, and nervous system. It is sometimes used in combination with other medications to treat symptoms of low corticosteroid levels (lack of certain substances that are usually produced by the body and are needed for normal body functioning) and in the management of certain types of shock.

372.     Dexamethasone injection is in a class of medications called corticosteroids. It works to treat people with low levels of corticosteroids by replacing steroids that are normally produced naturally by the body. It also works to treat other conditions by reducing swelling and redness and by changing the way the immune system works.

373.     Dexamethasone injection was recklessly and improperly used by the Provider Defendants. There are adverse side effect from such injections including headache; slowed healing of cuts and bruises; thin, fragile, or dry skin; red or purple blotches or lines under the skin; skin depressions at the injection site; increased body fat or movement to different areas of your body;

difficulty falling asleep or staying asleep; extreme changes in mood; changes in personality; depression; increased sweating; muscle weakness; joint pain; irregular or absent menstrual periods; hiccups; increased appetite; injection site pain or redness.

374.    Some side effects can be serious requiring emergency medical treatment: infection; seizures; vision problems; swelling of the eyes, face, lips, tongue, throat, arms, hands, feet, ankles, or lower legs; difficulty breathing or swallowing; shortness of breath; sudden weight gain; rash; hives and itching.

**F**. **The Fraudulent Charges Emanating from the Referral Entities**

375.    The Referral Entities purport to systemically subject Insureds to a battery of medically unnecessary products and services including, but not limited to, such things as extracorporeal shockwave therapy ("ESWT"); transcranial doppler testing ("TCD"); videonystagmography testing ("VNG"); ultrasound; durable medical equipment; topical creams; MRIs; and other services/products. As documented above these treatments are based upon referrals that are fraudulent for a host of reasons including: a complete and criminal lack of medical licensure; forgery, illegal referral payment arrangements; billing for services not provided as spawned by medical funding; improper performance of the services; products billed but never received and predetermined treatment protocols. Even if the referrals were proper and the Referral Entities were properly licensed the services are not proper because they are medically unnecessary.

376.    As of now this action does not seek monetary damages from the Referral Entities although they are certainly on notice.   As such this pleading will forgo the painstaking detail of the Referral Entities fraud.

### G. Many of The Referral Entities Are Engaged in The Illegal Practice of Medicine

377.    As voluminously discussed, many of the Referral Entities are not professional entities qualified to provide medical services such as Professional Corporations, Professional Limited Liability Companies or Medical Professionals earning incomes under their own names i.e. Sole Proprietorships. USAA has received voluminous billing for complicated diagnostic testing and other procedures described above by facially obviously unlicensed non-medical professional entities such as Wizard Computer Services, Inc; Green Power New York LLC; Concierge Diagnostics Inc.; Unisoft LLC; Bds Diagnostic Corp; Cardionostic Inc; Opp Rapid Diagnostics Inc; Isa Prompt Diagnostics Inc; Adv Diagnostic Inc; Bitachon Diagnostics Inc; Titan Diag. Imaging Inc; Prometheus Image, LLC; and Opaque NY Inc.   All of these entities as noted by Landow himself are facially ineligible to perform and bill for medical services.

378.    As discussed above all this billing was based upon the illegal referrals of the Provider Defendants.

379.    As of now this action does not seek monetary damages from the Referral Entities although they are certainly on notice.   As such this pleading will forgo the painstaking detail of the Referral Entities criminal practice of medicine.

### THE FRAUDULENT BILLING DEFENDANTS SUBMITTED OR CAUSED TO BE SUBMITTED TO PLAINTIFFS

380.   To support their fraudulent charges, Defendants systematically submitted or caused to be submitted to Plaintiffs hundreds of NF-3 forms, assignment of benefits forms and medical reports/records using the name of the Provider Defendants and ABC Referral Entities as well as their tax identification numbers seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

381. The NF-3 forms, reports, assignment of benefits and other documents submitted to Plaintiffs by and on behalf of Defendants were false and misleading in the following material respects:

(i) The NF-3 forms, letters and other supporting documentation submitted to Plaintiffs by and on behalf of Defendants uniformly misrepresented that Landow had performed or at least supervised, or at the very least controlled, the Fraudulent Services purportedly provided by the Provider Defendants and that his name, license and the tax identification number of the Provider Defendants was being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) despite the fact that the John and Jane Doe Defendants unlawfully and secretly controlled, operated and managed the Provider Defendants and their fraudulent referrals, as well as the Referral Entities.

(ii) The NF-3 forms, letters and other supporting documentation submitted to Plaintiffs by and on behalf of Defendants, uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided.

(iii) The NF-3 forms, letters and other supporting documentation submitted to Plaintiffs by and on behalf of the Defendants, uniformly concealed the fact that the Fraudulent Services were provided – to the extent provided at all –pursuant to illegal referral payment and referral arrangements.

(iv) The NF-3 forms, letters and other supporting documentation submitted to Plaintiffs by and on behalf of the Defendants uniformly misrepresented that the Fraudulent Services were medically necessary when the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and

## DEFENDANTS' FRAUDULENT CONCEALMENT AND USAA'S JUSTIFIABLE RELIANCE

382. Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to Plaintiffs.

383.   To induce Plaintiffs to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically made material misrepresentations, concealed their fraud and the underlying fraudulent scheme and went to great lengths to accomplish this concealment.

384.   Specifically, the Defendants knowingly misrepresented and concealed facts related to the participation of Landow in the performance of the Fraudulent Services and Landow's ownership, control and/or management of the Provider Defendants. Additionally, the Defendants entered complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged illegal referral payments for patient referrals.

385.   Furthermore, Defendants knowingly misrepresented and concealed facts in order to prevent Plaintiffs from discovering that the Fraudulent Services were medically unnecessary and performed, to the extent they were performed at all, pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

386.   Plaintiffs takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner. Plaintiffs are also under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to USAA in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause Plaintiffs to rely upon them. As a result, USAA incurred damages of more than $1,985,576.80_based upon the fraudulent

charges.

387.   Based upon Defendants' material misrepresentations and other affirmative acts to

conceal their fraud from Plaintiffs, Plaintiffs did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## <u>AS AND FOR A FIRST CAUSE OF ACTION</u>

**Against Landow and the Provider Defendants (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

388.    Plaintiffs incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 388 of this Complaint as if fully set forth at length herein.

389.    There is an actual case and controversy between Plaintiffs on the one hand and Landow and the Provider Defendants on the other hand regarding more than $1,383,364.60 in unpaid billing for the Fraudulent Services that has been submitted to Plaintiffs.

390.    Landow and the Provider Defendants have no right to receive payment from Plaintiffs on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to illegal payments and referral relationships between the Defendants and the Clinics.

391.    Landow and the Provider Defendants have no right to receive payment from Plaintiffs on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols that serve to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

392.    Landow and the Provider Defendants have no right to receive payment from Plaintiffs on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

393.    Landow and the Provider Defendants have no right to receive payment from Plaintiffs on the unpaid billing because the Defendants' sham services – for which they submitted bills – fraudulently misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to Plaintiffs.

394.    Landow and the Provider Defendants have no right to receive payment from Plaintiffs on the unpaid billing because the Defendants' sham services – for which they billed – fraudulently misrepresented that they were at least supervised or controlled by Landow and were instead controlled by – to the extent that they were provided at all – by unlicensed individuals who were neither supervised nor controlled by Landow.

395.    Accordingly, Plaintiffs requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Landow and the Provider Defendants have no right to receive payment for any pending bills submitted to Plaintiffs.

## AS AND FOR A SECOND CAUSE OF ACTION

### Against Landow and the John Doe and Jane Doe Defendants 1-10 (Violation of RICO, 18 U.S.C. § 1962(c))

396.    Plaintiffs incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 396 of this Complaint as if fully set forth at length herein.

397.    Macintosh is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. Landow and the John Doe and Jane Doe Defendants 1-10 knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Macintosh's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent

charges seeking payments that Macintosh was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe and Jane Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on Plaintiffs and other New York automobile insurers, (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics, (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided.

398.    Macintosh's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the Defendants operated Macintosh, inasmuch as Macintosh never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the Macintosh to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Macintosh to the present day.

399.    Macintosh is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to Plaintiffs and other New York automobile

insurers. These inherently unlawful acts are taken by Macintosh in pursuit of inherently unlawful goals – namely, the theft of money from Plaintiffs and other insurers through fraudulent no-fault billing. USAA has been injured in its business and property by reason of the above-described conduct in that it has paid at least $ 602,212.14 pursuant to the fraudulent bills submitted by the Defendants through Macintosh.

400.   By reason of its injury, Plaintiffs is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION

### Against Landow and John and Jane Doe Defendants 1-10 (Violation of RICO, 18 U.S.C. § 1962(d))

401.   Plaintiffs incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 401 of this Complaint as if fully set forth at length herein.

402.   Macintosh is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

403.   Landow and the John Doe and Jane Doe Defendants 1-10 are employed by and/or associated with Macintosh.   Landow and the John Doe and Jane Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Macintosh's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that Macintosh was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed

physician, but which was being operated, managed, and controlled by the John and Jane Doe Defendants 1-10 for purposes of effectuating a large-scale insurance fraud scheme on Plaintiffs and other New York automobile insurers, (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics, (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided. The fraudulent billings and corresponding mailings submitted to Plaintiffs that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint will be made available for inspection or exchanged by electronic discovery means.

404.    Landow and the John and Jane Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud Plaintiffs and other insurers of money) by submitting or facilitating the submission of fraudulent charges Plaintiffs.

405.    Plaintiffs have been injured in its business and property by reason of the above-described conduct in that it has paid at least $602,212.24 pursuant to the fraudulent bills submitted by Defendants through Macintosh.

406.    By reason of its injury, Plaintiffs are entitled to treble damages, costs, and reasonable

attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A FOURTH CAUSE OF ACTION

### Against Landow and the John Doe and Jane Doe Defendants 1-10 (Violation of RICO, 18 U.S.C. § 1962(c))

407.    Plaintiffs incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 406 of this Complaint as if fully set forth at length herein.

408.    Atlantic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. Landow and the John Doe and Jane Doe Defendants 1-10 knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Atlantic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Atlantic was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe and Jane Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on Plaintiffs and other New York automobile insurers, (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics, (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services

that purportedly were provided. The fraudulent billings and corresponding mailings submitted to Plaintiffs that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint will be made available for inspection or exchanged by electronic discovery means.

409. Atlantic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the Defendants operated Atlantic, inasmuch as Atlantic never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for Atlantic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Atlantic to the present day.

410. Atlantic is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to Plaintiffs and other New York automobile insurers. These inherently unlawful acts are taken by Atlantic in pursuit of inherently unlawful goals – namely, the theft of money from Plaintiffs and other insurers through fraudulent no-fault billing. Plaintiffs have been injured in its business and property by reason of the above-described conduct in that it has paid at least $168,384.29 pursuant to the fraudulent bills submitted by the Defendants through Atlantic.

411. By reason of its injury, Plaintiffs are entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION

### Against Landow and John and Jane Doe Defendants 1-10 (Violation of RICO, 18 U.S.C. § 1962(d))

412.   Plaintiffs incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 411 of this Complaint as if fully set forth at length herein.

413.   Atlantic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

414.   Landow and the John Doe and Jane Doe Defendants 1-10 are employed by and/or associated with Atlantic.   Landow and the John Doe and Jane Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Atlantic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that Atlantic was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe and Jane Doe Defendants 1-10 for purposes of effectuating a large-scale insurance fraud scheme on Plaintiffs and other New York automobile insurers, (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics, (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and (iv) the claim submissions

seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided. The fraudulent billings and corresponding mailings submitted to Plaintiffs that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint will be made available for inspection or exchanged by electronic discovery means.

415. Landow and the John Doe and Jane Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud Plaintiffs and other insurers of money) by submitting or facilitating the submission of fraudulent charges to Plaintiffs.

416. Plaintiffs have been injured in its business and property by reason of the above-described conduct in that it has paid at least $168,384.29 pursuant to the fraudulent bills submitted by Defendants through Atlantic.

417. By reason of its injury, Plaintiffs are entitled to treble damages, costs, and reasonable

attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A SIXTH CAUSE OF ACTION

### Against All Defendants (Common Law Fraud)

418. Plaintiffs incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 417 of this Complaint as if fully set forth at length herein.

419. Defendants intentionally and knowingly made false and fraudulent statements of material fact to Plaintiffs and concealed material facts from Plaintiffs during their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

420.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Landow had performed, inasmuch as he purported to control, the Fraudulent Services and that his name, license and the tax identification number of the Provider Defendants was being legitimately used to bill for the Fraudulent Services, making the Provider Defendants eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact Landow never supervised nor controlled any of the services and the John Doe and Jane Doe Defendants 1-10 unlawfully and secretly controlled, operated and managed the Provider Defendants, (ii) the representation that the billed for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided, (iii) the representation that the billed for services were eligible for reimbursement, when in fact the services were provided – to the extent provided at all – pursuant to illegal referral payment and referral arrangements between the Defendants and the Clinics, and (iv) the representation that the billed for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

421.    Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce Plaintiffs to pay charges submitted through the Provider Defendants that were not compensable under New York no-fault insurance laws.

422.    Plaintiffs justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by

reason of the above–described conduct in that it has paid at least $770,596.53 pursuant to the fraudulent bills submitted by the Defendants.

423.    Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

424.    Accordingly, by virtue of the foregoing, Plaintiffs is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### Against All Defendants (Unjust Enrichment)

425.    Plaintiffs incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 424 of this Complaint as if fully set forth at length herein.

426.    As set forth above, Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Plaintiffs.

427.    When Plaintiffs paid the bills and charges submitted by or on behalf of the Provider Defendants Practice for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants improper, unlawful, and/or unjust acts.

428.    Defendants have been enriched at Plaintiffs' expense by Plaintiffs' payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper,

unlawful, and unjust billing scheme.

429.    Defendants' retention of Plaintiffs' payments violate fundamental principles of justice, equity and good conscience.

430.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $770,596.53.

## JURY DEMAND

431.   Pursuant to Federal Rule of Civil Procedure 38(b), USAA demands a trial by jury.

**WHEREFORE**, Plaintiff UNITED SERVICE AUTOMOBILE ASSOCIATION. USAA GENERAL INDEMNITY COMPANY, USAA CASUALTY INSURANCE COMPANY, and GARRISON PROPERTY and CASUALY INSURANCE COMPANY demand that a Judgment be entered in their favor and against the Defendants, as follows:

(i)      On the First Cause of Action against Landow and the Provider Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Landow and the Provider Defendants have no right to receive payment for any pending bills for the Fraudulent Services submitted to Plaintiffs;

(ii)     On the Second Cause of Action against Landow and John Doe and Jane Doe Defendants 1-10, compensatory damages in favor of Plaintiffs in an amount to be determined at trial but in excess of $770,596.53 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

(iii)    On the Third Cause of Action against Landow and John Doe and Jane Doe Defendants 1-10, compensatory damages in favor of Plaintiffs in an amount to be determined at trial but in excess of $770,596.53 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(d) plus interest;

(iv)     On the Fourth Cause of Action against Landow and the John and Jane Doe Defendants 1-10, compensatory damages in favor of Plaintiffs in an amount to be

determined at trial but in excess of $770,596.53 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

(v)     On the Fifth Cause of Action against Landow and John Doe and Jane Doe Defendants 1-10, compensatory damages in favor of Plaintiffs in an amount to be determined at trial but in excess of $770,596.53 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(d) plus interest;

(vi)    On the Sixth Cause of Action against all Defendants, compensatory damages in favor of Plaintiffs in an amount to be determined at trial but in excess of $770,596.53 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

(vii)   On the Seventh Cause of Action against all Defendants, more than $770,596.53 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: Melville, New York
       May 9, 2024

**BRUNO, GERBINO & SORIANO & AITKEN, LLP**

By: *Vincent F. Gerbino*
    VINCENT F. GERBINO
    *Attorneys for Plaintiffs*
    445 Broad Hollow Road, Suite 420
    Melville, New York 11747-4712
    (631) 390-0010
    (631) 393-5497 – *facsimile*